| | |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>    Plaintiffs,<br><br>    v.<br><br>STATE OF WISCONSIN; ANTHONY S. EVERS, in his official capacity as Governor of WISCONSIN; JOSHUA L. KAUL, in his official capacity as Attorney General of WISCONSIN; STATE OF WISCONSIN DEPARTMENT OF ADMINISTRATION DIVISION OF GAMING; JOHN DILLETT, in his official capacity as Administrator of the Wisconsin Department of Administration Division of Gaming,<br><br>    Defendants. | Case No. 2:26-cv-749<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**COMPLAINT**

Plaintiffs, the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## I.  INTRODUCTION

1.  The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, provides a comprehensive framework for the regulation of commodity derivatives transactions in the United States. This federal law designates the CFTC as the federal agency with "exclusive jurisdiction" over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). Plaintiffs bring this action to halt defendants' efforts to apply and enforce preempted state laws to national markets that are governed by federal law.

1

2. On April 23, 2026, the State of Wisconsin filed civil enforcement actions against Coinbase Global, Inc., and Coinbase Financial Markets, Inc. ("Coinbase"); Kalshi, Inc., KalshiEX, LLC, Kalshi Klear, Inc., Kalshi Klear, LLC, Kalshi Trading, LLC ("Kalshi"); Robinhood Derivatives, LLC and Robinhood Securities, LLC ("Robinhood"); Blockratize, Inc. d/b/a Polymarket, QCX, LLC d/b/a Polymarket U.S., QC Clearing, LLC d/b/a Polymarket Clearing ("Polymarket"); and Foris DAX Markets, Inc. and North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America ("Crypto.com"). These five entities, including parent companies and their subsidiaries, offer event contracts on CFTC-regulated national markets. Wisconsin's lawsuits allege that the five entities are creating public nuisances by allegedly violating Wis. Stat. § 945.03(1m)(b), (c), and (g). Wisconsin seeks: (a) declarations that Coinbase, Kalshi, Robinhood, Polymarket, and Crypto.com are violating Wis. Stat. § 945.03(1m)(b), (c), and (g) and causing a public nuisance; and (b) preliminary and permanent injunctions prohibiting Coinbase, Kalshi, Robinhood, Polymarket, and Crypto.com from offering sports-related event contracts for trading in Wisconsin.

3. In a press release announcing the lawsuits, Attorney General Joshua Kaul claimed that Coinbase, Kalshi, Robinhood, Polymarket, and Crypto.com are "facilitati[ng] . . . illegal sports betting, a form of unlawful commercial gambling, in Wisconsin."[1] According to Attorney General Kaul, these five entities "generate revenue from Wisconsinites by violating the state's gambling laws" and "have chosen to flout Wisconsin law through disguising the sports betting they facilitate on their online platforms as 'event contracts,' which pay out just like ordinary bets based on the odds of sports-related outcomes." *Id.*

---

[1] Press Release, Josh Kaul, Att'y Gen. of Wis., Wisconsin DOJ Sues To Stop Alleged Illegal Sports Betting Operations in Wisconsin (Apr. 23, 2026), https://www.wisdoj.gov/PressReleases/press-release-sports-betting.pdf.

2

4. Defendants assert that Wisconsin law permits defendants to ban and criminalize markets over which Congress has granted "exclusive jurisdiction" to regulate to the CFTC. Defendants seek to prohibit CFTC-regulated Designated Contract Markets ("DCMs"), both directly and through Futures Commission Merchants ("FCMs"), from operating in Wisconsin and offering Wisconsin customers access to event contracts—a type of derivative instrument regulated by federal law that, absent certain narrow exceptions, can be traded only on CFTC-regulated exchanges in transactions facilitated by CFTC-regulated markets and intermediaries.

5. Wisconsin's attempt to criminalize and shut down federally regulated markets intrudes on the exclusive federal scheme Congress designed to oversee national swaps markets. Prompted by the evolution of national financial markets and repeated conflicts with state law, Congress enacted the CEA, granting the CFTC exclusive jurisdiction to regulate those markets and enacting a comprehensive federal regulatory framework that preempts state laws that attempt to ban the operation of, or transactions on, CFTC-regulated exchanges. This comprehensive federal regulatory scheme preempts Wisconsin law as applied to event contracts traded on federally regulated exchanges.

6. Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event will occur. When structured as "swaps" or futures contracts as defined by the CEA, and traded on CFTC-regulated exchanges, they are subject to the exclusive jurisdiction of the CFTC.

7. As of the date of filing of this complaint, at least eight CFTC-regulated DCMs have collectively self-certified with the CFTC more than 3,000 event contracts pursuant to CFTC Rule 17 C.F.R. § 40.2.

8. Defendants have made clear that they believe event contracts, including sports-

3

related event contracts listed on CFTC-regulated markets, are bets, rather than swaps, and so may be banned by the Wisconsin Department of Administration Division of Gaming.

9.     Event contracts do not fall under the definition of "bets" as defined in Wis. Stat. § 945.01(1).  Therefore, offering event contracts for trade to residents of Wisconsin cannot violate Wis. Stat. § 945.03.

10.    Defendants misapprehend both the nature of these contracts offered on CFTC-regulated markets and the federal regulatory framework.  Event contracts, including sports-related or political event contracts that are listed on CFTC-regulated DCMs, are covered by the CEA, and the CEA prohibits States from invading the CFTC's exclusive jurisdiction over event contract transactions offered by and executed on federally regulated DCMs.  The defendants prohibit these DCMs from operating in Wisconsin.  Defendants' actions thus assert authority over DCMs directly in conflict with the CEA and rules promulgated by the CFTC under the CEA, and those actions must be preempted.  This Court should put an end to the ongoing efforts by defendants to undermine the uniform application of federal law by declaring that Wisconsin gambling and betting bans or regulations are preempted by federal law as applied to event contract swaps listed for trading on CFTC-regulated DCMs and are thus unlawful.

11.    Unless restrained and enjoined by the Court, defendants are likely to continue their attempts to subvert federal law and the exclusive jurisdiction to regulate event contract swaps conferred on the CFTC by Congress.

12.    Defendants' aggressive enforcement of their preempted state laws causes irreparable harm to the federal plaintiffs because it is disrupting the operation of federally regulated markets and impairing the CFTC's ability to apply and enforce its own regulations and the federal CEA.  Absent an injunction, the United States and the CFTC will suffer irreparable harm.

## II. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). This action presents a federal question under the laws and Constitution of the United States because it concerns whether the CEA, 7 U.S.C. §§ 1, *et seq.*, preempts Wisconsin's gambling laws insofar as they purport to regulate transactions on a CFTC-regulated DCM, both directly and through CFTC-regulated FCMs.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this district, a substantial part of events giving rise to the claims occurred in the district, and all defendants are residents of the State.

## III. PARTIES

15. Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws, through its executive agency, the CFTC.

16. Plaintiff CFTC is an agency of the United States Government that administers and enforces the CEA. The CEA grants the CFTC authority to represent itself through its General Counsel. 7 U.S.C. § 2(a)(4).

17. Defendant State of Wisconsin is a state of the United States. The State is at home, or resides in, all federal districts within the state.

18. Defendant Anthony S. Evers is the Governor of Wisconsin and is sued in his official capacity. Under the Wisconsin Constitution, the Governor of Wisconsin "shall take care that the laws be faithfully executed." Wis. Const. art. V, § 4.

19. Defendant Joshua L. Kaul is the Attorney General of Wisconsin and is sued in his

5

official capacity. The Attorney General of Wisconsin is the state's chief legal officer.

20. Defendant State of Wisconsin Department of Administration Division of Gaming ("Division of Gaming") is the Wisconsin state agency that regulates gambling in the State of Wisconsin. The Division of Gaming oversees licensing, regulating, investigating and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming-related vendors in Wisconsin.

21. Defendant John Dillett is the Administrator of the Division of Gaming and is sued in his official capacity.

## IV. OTHER RELEVANT ENTITIES

22. Kalshi is registered with the CFTC as a DCM. Kalshi obtained CFTC designation as a Contract Market on November 3, 2020. Under the terms and conditions of the CFTC's Order of Designation, Kalshi must comply with all applicable provisions of the CEA and all requirements in the CFTC's regulations governing DCMs.

23. Coinbase is registered with the CFTC as an FCM. Coinbase entered a partnership with Kalshi that allows Coinbase's customers to use its platform to trade event contracts listed on Kalshi's exchange. Kalshi obtained CFTC designation as a Contract Market on November 3, 2020. As a CFTC-registered FCM, Coinbase is an intermediary for customers trading regulated derivatives on DCMs, including event contracts listed on Kalshi's exchange.

24. Robinhood is registered with the CFTC as an FCM. In January 2026, through a partnership, Robinhood acquired 90% of LedgerX LLC d/b/a MIAX Derivatives Exchange or MIAXdx, a CFTC DCM. After the acquisition MIAXdx changed its legal name to Rothera Exchange and Clearing LLC ("Rothera"). Robinhood's acquisition of Rothera allows its customers to use its platform to trade event contracts listed on Rothera's exchange. As a CFTC-

6

registered FCM, Robinhood is an intermediary for customers trading regulated derivatives on DCMs, including event contracts listed on Rothera's exchange.

25. QCX, LLC (part of Polymarket) is a CFTC DCM. QCX obtained CFTC designation as a Contract Market on July 9, 2025. QCX, LLC now operates under the name of Polymarket US. Under the terms and conditions of the CFTC's Order of Designation, Polymarket must comply with all applicable provisions of the CEA and all requirements in the CFTC's regulations governing DCMs.

26. North American Derivatives Exchange, Inc., doing business as Crypto.com | Derivatives North America is a CFTC DCM. Crypto.com operates a DCM and Derivatives Clearing Organization ("DCO") regulated by the CFTC under the CEA, where users can trade financial products, including sports event contracts. Under the terms and conditions of the CFTC's Order of Designation, Crypto.com must comply with all applicable provisions of the CEA and all requirements in the CFTC's regulations governing DCMs.

## V. FEDERAL LAW GOVERNING COMMODITY DERIVATES MARKET

### A. Congress Vested the CFTC with Exclusive Regulatory Authority Over U.S. Commodity Derivates Markets

27. The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3. The Constitution also vests the President of the United States with the "executive Power," U.S. Const. art. II, § 1, and authorizes the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

28. Based on its enumerated constitutional and sovereign powers to regulate interstate commerce, the United States has broad authority to regulate futures and derivatives markets. That authority includes the power to enforce the supremacy of federal law regulating futures and

7

derivatives markets.

29.     The United States has well-established, comprehensive, and preemptive authority to regulate U.S. financial markets.  The CEA is the federal statute that provides a comprehensive federal framework for the regulation of commodity derivatives transactions in the United States.

30.     The CFTC is the federal executive agency charged with administering and enforcing the CEA.  Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the then-existing patchwork of state-by-state regulation had impaired the development and functioning of national commodity derivatives markets.  *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.

31.     Derivatives are financial instruments such as futures, options, or swaps that derive their value from something else, like a benchmark or a physical commodity.  In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

32.     The CEA requires that, subject to certain exemptions or exceptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.  For example, trading of commodity futures contracts must be conducted on a board of trade designated by the CFTC as a contract market or a registered foreign board of trade (*see* 7 U.S.C. § 6 and 17 C.F.R. § 48.3); no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or designated as a contract market (*see* 7 U.S.C. § 7b-3(a) and 17 C.F.R. § 37.3); commodity options must likewise be conducted on a board of trade designated as a contract market (*see* 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2).

33.     The purpose of the CEA is to "serve the public interests . . . through a system of

effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).

34. DCMs are boards of trade or exchanges that operate under the regulatory oversight of the CFTC pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The CFTC designates a board of trade as a contract market through a formal application process through which an applicant board of trade must demonstrate its ability to comply with detailed statutory requirements called "core principles." 7 U.S.C. § 7(d). These core principles require, among other things, that DCMs:

   a. "[E]stablish, monitor, and enforce compliance with the rules of the contract market, including—(i) access requirements; (ii) the terms and conditions of any contracts to be traded on the contract market; and (iii) rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A).

   b. "[H]ave the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market." 7 U.S.C. § 7(d)(2)(B).

   c. "[L]ist on the contract market only contracts that are not readily susceptible to manipulation." 7 U.S.C. § 7(d)(3).

   d. "[H]ave the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including—(A) methods for conducting real-time monitoring of trading; and (B) comprehensive and accurate trade reconstructions." 7 U.S.C. § 7(d)(4).

   e. "[P]rovide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process . . . ." 7 U.S.C. § 7(d)(9).

   f. "[M]aintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information—(A) to assist in the prevention of customer and market abuses; and (B) to provide evidence of any violations of the rules of the contract market." 7 U.S.C. § 7(d)(10).

9

g. "[E]stablish and enforce—(A) rules and procedures for ensuring the financial integrity of transactions . . . and (B) . . . (ii) the protection of customer funds." 7 U.S.C. § 7(d)(11)

h. "[E]stablish and enforce rules—(A) to protect markets and market participants from abusive practices committed by any party . . . and (B) to promote fair and equitable trading on the contract market." 7 U.S.C. § 7(d)(12).

35. The CFTC has enacted detailed rules governing the process through which a board of trade can achieve designation as a contract market, and detailed rules governing the operations of the contract market once that designation is in place. 17 C.F.R. § 38, *et seq.* DCMs may list for trading commodity futures, options, or swaps as permitted by Part 38 of the CFTC's regulations, 17 C.F.R. § 38, *et seq.*

36. Event contracts listed on CFTC-regulated DCMs are a type of "swap" as defined by the CEA. Section 1a(47) of the CEA, 7 U.S.C. § 1a(47), broadly defines "swap" to include "any agreement, contract, or transaction"—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

37. The CEA and CFTC Regulations establish important protections for derivatives markets, market participants, and the general public by creating uniform regulations of a nationwide—and often international—market. For example, DCMs must conform to core principles that are designed to achieve the prevention of market abuse (7 U.S.C. § 7(d)(12)(A));

10

ensure their financial stability (7 U.S.C. § 7(d)(21)); protect their information security (17 C.F.R. § 38.1051(a)(2)); and safeguard their systems in the event of a disaster (17 C.F.R. § 38.1051(a)(3)). Further, DCMs must ensure that the contracts that they list for trading are "not readily susceptible to manipulation" (7 U.S.C. § 7(d)(3)); DCMs must "prevent market disruption" (7 U.S.C. § 7(d)(4)); DCMs must impose position limits designed to reduce the potential threat of market manipulation or congestion (7 U.S.C. § 7(d)(5)); DCMs must establish and enforce rules to minimize conflicts of interest (7 U.S.C. § 7(d)(16)); DCMs must provide impartial access to traders (17 C.F.R. § 38.151); and DCMs must maintain and retain important records and provide them to the Commission (7 U.S.C. § 7(d)(18)). And the CEA conferred on the CEA enforcement authority to "bring an action in . . . [a] district court . . . to enjoin . . . or to enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery or any swap." 7 U.S.C. § 13a-1(a).

38. Today there are 25 exchanges in the United States have active designations from the CFTC to operate as a contract market. These DCMs include Kalshi, Polymarket, and Crypto.com.

### B. State Attempts to Shut Down National Markets Drives Early Derivatives Regulation

39. By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation. But States and courts impeded these new markets, often failing to distinguish between futures trading and "gambling" or "wagering," with many states even prohibiting futures trading as a form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S.

11

499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").

40. Indeed, some States, including New York, criminalized futures contracts. *See, e.g., People ex rel. Collins v. McLaughlin*, 128 A.D. 599, 608 (N.Y. App. Div. 1908) (quoting Penal Law § 343); *Melchert v. Am. Union Tel. Co.*, 11 F. 193, 196 (C.C.D. Iowa 1882) (quoting Ill. Rev. Stat. 1874, § 138). In 1889, the New York Penal Law criminalized the use of a room "for making any wagers or bets made to depend upon . . . the future price of stocks, bonds, securities, commodities or property of any description whatever." *Collins*, 128 A.D. at 608. In 1888, the Illinois Supreme Court described "dealing in 'futures' or 'options'" as "a crime against the state, a crime against the general welfare and happiness of the people, a crime against religion and morality, and a crime against all legitimate trade and business." *Cothran*, 16 N.E. at 648.

41. Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. As Justice Holmes and the Supreme Court noted in *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247-48 (1905):

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

42. Congress, recognizing the value of these new markets and the negative effects of a

patchwork of state regulation, centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States").

43. Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936). But even as market participants expanded futures markets beyond their agricultural origins, those market participants continued to face the persistent threat of state prosecution through a patchwork of state laws and regulations.

### C. Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974

44. In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." Review of Commodity Exch. Act and Discussion of Possible Change: Hearings Before the H. Comm. on Agric*.,* 93d Cong., 1st Sess. 121 (1973). Congress quickly responded, explicitly addressing the issue the following year when it passed the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").

45. With the passage of the CFTC Act of 1974, Congress amended the CEA to explicitly give the CFTC "exclusive jurisdiction" over commodity derivatives transactions

13

including futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). The CFTC Act of 1974 amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways. First, Congress established the CFTC, vesting in this federal executive agency the authority to administer the CEA. Second, Congress expanded the scope of the CEA to cover "all commodities." Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets.

46. The CFTC Act of 1974 amended Section 2 of the CEA to provide that "the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . . , and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market." CFTC Act of 1974, Section 201(b), 88 Stat. at 1395 (codified at 7 U.S.C. § 2(a)(1)).

47. Preemption was an express goal of the CFTC Act of 1974. Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." See Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Potentially limiting language was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis). The CFTC Act of 1974 "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No.

14

93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

### D. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974

48. Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the CFTC's exclusive jurisdiction over futures and options.

49. In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the CFTC's exclusive authority over futures transactions on CFTC-regulated DCMs while clarifying the states' ability to pursue certain violations of the CEA against actors other than federally regulated exchanges. The 78 Act added a section to the CEA authorizing states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes. See 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978). Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974. Proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also further added to the list of justifications supporting the CFTC's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*

50. The Futures Trading Act of 1982 (the "82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the States in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the provisions of the Act, thereby preempting any State

15

regulatory laws." H.R. Rep. No. 97-565, at 44-45 & 102-03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3893-94 & 3951-52. First, the 82 Act clarified the procedures for States to pursue violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act clarified the role of states with respect to off-exchange futures transactions. Language was added to permit "criminal prosecution under any federal criminal statute" and the application of federal or state laws to off-exchange transactions or unregistered market participants. 82 Act, Pub. L. 97-444, § 229, 96 Stat. 2294, 2318 (1982). Other state laws that could arguably apply to DCMs and market participants registered with the CFTC remained preempted. See H.R. Rep. No. 97-565, at 44-45 & 102-103, 1982 U.S.C.C.A.N. at 3893-94, 3951-52. Congress explained that it "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recogniz[ing] the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." *Id.*

51. In 1992, Congress again adjusted its regulatory framework to capture a new type of derivative financial product: swaps. In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. 102-546, 106 Stat. 3590 (1992), Congress gave the CFTC authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") swap transactions from the CEA's mandatory exchange trading regime for futures and options. The 92 Act added language to CEA Section 12(e), 7 U.S.C. § 16(e), expressly "supersed[ing] and preempt[ing] the application of any State or local" gambling or bucket shop laws as applied to OTC derivatives (swaps) transactions that the CFTC had exempted pursuant to its new authority in CEA Section 4(c), 7 U.S.C. § 6(c). While the 82 Act reserved to the States some authority to apply state and local laws to off-exchange futures transactions, the 92 Act cut back state authority for off-exchange swaps that received an exemption from the CFTC. Congress's goal was, again, to provide "legal certainty under both the Act and

16

state gaming and bucket shop laws for transactions covered by the terms of an exemption." H.R. Rep. No. 102-978, at 80 (1992) (Conf. Rep.), *reprinted in* 1992 U.S.C.C.A.N. 3179, 3212.

52. Congress again limited the authority of States to regulate derivatives transactions in 2000 with the passage of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, Appendix E & § 103, 114 Stat. 2763A-365, 2763A-377 (2000). The CFMA exempted or excluded swap transactions from the CEA's exchange trading requirements while also preempting the application of state and local laws to those "excluded" swap transactions. The existing preemption of state and local laws as to on-exchange transactions therefore remained in place, and the preemption of state and local laws as to off-exchange transactions (exempt or excluded swaps) was expanded.

### E. Congress Embraced Preemption for Swaps Transactions in the Dodd Frank Act

53. In the wake of the 2008 financial crisis, Congress reworked the regulatory structure for the swaps market, creating a framework within the CEA for the on-exchange execution, clearing and reporting of vast portions of those swaps. The 2010 Dodd-Frank Act expressly extended the CFTC's "exclusive jurisdiction" to encompass "transactions involving swaps," eliminating the remaining concurrent jurisdiction of States as to off-exchange swap transactions. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A). After Dodd-Frank, Congress had removed all authority for States to regulate swaps of any kind, creating a complete framework for the CFTC's exclusive jurisdiction and occupying the regulatory field.

54. In the Dodd-Frank Act, Congress made clear that the CFTC has exclusive jurisdiction over event contracts. In CEA § 5c(c)(5)(C) (codified at 7 U.S.C. § 7a-2(c)(5)(C)), Congress provided the CFTC with specific oversight and prohibitory authority over event contracts. Under § 5c(c)(5)(C), the CFTC "may determine" that event contracts involving certain

17

categories "are contrary to the public interest" and may not be listed on CFTC-regulated markets. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii).

55. By creating a specific public interest review process, Congress signaled that these contracts belong within the CFTC's exclusive regulatory purview, not the States'.

**F. The CFTC Uses Its Authority to Carry Out Congress's Directives**

56. The CEA confers on the CFTC the authority to make rules governing swaps and other futures and derivatives contracts. See, *e.g.*, 7 U.S.C. §§ 2, 6, 6s, 7. Pursuant to that authority, the CFTC has for decades promulgated rules that regulate a large, nationwide industry and which seek to provide clarity to the industry, market participants, and the public. See 17 C.F.R. § 1.1, *et seq*.

57. Part of the CFTC's responsibilities include issuing guidance and promulgating new rules to provide certainty when markets change and innovate. The CFTC already has extensive rules on what a DCM must do to become certified with the Commission, see 17 C.F.R. Part 38, and what a DCM must do to either self-certify a contract before listing, see 17 C.F.R. § 40.2, or to submit a contract for the CFTC to approve, see 17 C.F.R. § 40.3.

58. Since 2000, DCMs have been required to certify to the CFTC that a contract complies with the CEA before it can be listed for trading. In 2010, through the Dodd-Frank Act, Congress created Section 5c(c)(5)(C) of the CEA authorizing the CFTC to prohibit DCMs from offering event contracts that are contrary to the public interest. Section 5c(c)(5)(C) of the CEA is commonly known as the "Special Rule."

59. Rule 40.11 implements the Special Rule by prohibiting DCMs from offering event contracts "that involve[ ], relate[ ] to, or reference[ ] terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). The CFTC is

18

empowered by Congress to prohibit DCMs from offering event contracts that it determines "to be contrary to the public interest." *Id.* § 40.11(a)(2).

60.     The CEA's layered oversight approach also requires DCMs to serve as the first line of defense in policing their markets. Before listing an event contract for trade, a DCM must provide the CFTC with information including the contract's rules, "a concise explanation and analysis" of the contract's "terms and conditions," and "a certification . . . that the product to be listed complies with the [CEA] and [CFTC] regulations." 17 C.F.R. § 40.2(a)(3). The CFTC can also require DCMs to turn over "evidence, information or data" proving compliance with the CEA. *Id.* § 40.2 (b). If a DCM fails to provide this information or offers a "false certification," the CFTC "may stay the listing of a contract." *Id.* § 40.2 (c). The CEA, through Special Rule and Rule 40.11, leaves DCMs with no choice but to deploy "safeguards" throughout their platforms to ensure compliance with CFTC regulations.[2]

61.     With respect to event contracts, the CFTC recently published an advisory letter to DCMs on prediction markets and event contracts, Prediction Markets Advisory, CFTC Letter No. 26-08 (Mar. 12, 2026) (see CFTC Prediction Markets Advisory Press Release, https://www.cftc.gov/PressRoom/PressReleases/ 9193-26 (last visited 3/18/2026)).

62.     To provide additional clarity in the marketplace, the CFTC is in the process of writing and revising its rules applicable to event contracts and prediction markets. On March 16, 2026, the CFTC published in the Federal Register an advance notice of proposed rulemaking soliciting public comments on prediction markets, 91 Fed. Reg. 12516 (Mar. 16, 2026).

---

[2] *See, e.g.,* Jasper Ward, *Kalshi suspends three US congressional candidates for 'political insider trading'*, REUTERS, Apr. 22, 2026, https://www.reuters.com/world/us/kalshi-suspends-three-us-congressional-candidates-political-insider-trading-2026-04-22/.

19

## VI. WISCONSIN PURSUES CIVIL ENFORCEMENT ACTIONS AGAINST CFTC-DESIGNATED CONTRACT MARKET

63. On April 23, 2026, the Wisconsin Attorney General filed a civil enforcement action against Coinbase, Kalshi, and Robinhood in Wisconsin Circuit Court. *See Wisconsin v. Kalshi, et al.*, No. 2026CV001284 (Wis. Cir. Ct.). The Attorney General alleges that Coinbase, Kalshi, and Robinhood are engaged in illegal gambling in violation of Wis. Stat. § 945.03(1m)(b), (c), and (g), thereby causing a public nuisance. The Attorney General seeks: (1) a declaration that Coinbase, Kalshi, and Robinhood are causing a public nuisance in Wisconsin under Wis. Stat. § 945.03(1m)(b), (c), and (g) by making sports-related events contracts available for trading by customers located in Wisconsin; and (b) preliminary and permanent injunctions prohibiting Coinbase, Kalshi, and Robinhood from offering sports-related events contracts in Wisconsin. On April 24, 2026, the case was removed to the United States District Court for the Western District of Wisconsin. *See Wisconsin v. Kalshi, et al.*, No. 3:26-cv-00378 (W.D. Wis.).

64. On April 23, 2026, the Wisconsin Attorney General filed a civil enforcement action against Polymarket in Wisconsin Circuit Court. *See Wisconsin v. Blockratize, Inc., et al.*, No. 2026CV001285 (Wis. Cir. Ct.). The Attorney General alleges that Polymarket is engaged in illegal gambling in violation of Wis. Stat. § 945.03(1m)(b), (c), and (g), thereby causing a public nuisance. The Attorney General seeks: (1) a declaration that Polymarket is causing a public nuisance in Wisconsin under Wis. Stat. § 945.03(1m)(b), (c), and (g) by making sports-related events contracts available for trading by customers located in Wisconsin; and (b) preliminary and permanent injunctions prohibiting Polymarket from offering sports-related events contracts in Wisconsin. On April 24, 2026, the case was removed to the United States District Court for the Western District of Wisconsin. *See Wisconsin v. QCX, LLC, et al.*, No. 3:26-cv-00375 (W.D. Wis.).

65. On April 23, 2026, the Wisconsin Attorney General filed a civil enforcement action

against Crypto.com in Wisconsin Circuit Court. *See Wisconsin v. Foris DAX Mkt., Inc., et al.*, No. 2026CV001286 (Wis. Cir. Ct.). The Attorney General alleges that Cyrpto.com is engaged in illegal gambling in violation of Wis. Stat. § 945.03(1m)(b), (c), and (g), thereby causing a public nuisance. The Attorney General seeks: (1) a declaration that Cyrpto.com is causing a public nuisance in Wisconsin under Wis. Stat. § 945.03(1m)(b), (c), and (g) by making sports-related events contracts available for trading by customers located in Wisconsin; and (b) preliminary and permanent injunctions prohibiting Cyrpto.com from offering sports-related events contracts in Wisconsin. On April 24, 2026, the case was removed to the United States District Court for the Western District of Wisconsin. *See Wisconsin v. Foris DAX Mkt., Inc., et al.*, No. 3:26-cv-00381 (W.D. Wis.).

66. Kalshi, Polymarket, Crypto.com, and DCMs like them provide event contracts available for trades, as regulated under the CEA and supervised by the CFTC. Each of these companies has been designated as a contract market under 17 C.F.R. Part 38 and lists these event contracts through the self-certification process outlined in 17 C.F.R. § 40.2 or the submission process outlined in 17 C.F.R. § 40.3.

67. Defendants' attempt to regulate and seek civil injunctions and penalties against DCMs and FCMs, like Coinbase and Robinhood, that offer events contracts listed on DCMs interferes with Plaintiffs' exclusive authority to uniformly regulate and monitor this congressionally defined market. The purpose of the CEA is to create a uniform and predictable nationwide market for futures trading, and the CFTC oversees that market via its certification process of DCMs and its requirements for DCMs to comply with the self-certification or submission certification requirements before listing event contracts. Defendants' civil enforcement actions undermine that uniformity, thwarts Congress's scheme, and intrudes on

Plaintiffs' exclusive jurisdiction. Defendants' approach makes it much more difficult for the CFTC to regulate, advise, and enforce its authority over the DCMs, wasting resources and subverting CFTC's congressionally mandated authority.

68. The defendants directly violate and undermine the CFTC's regulation requiring "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). The defendants' disruption of this regulatory authority constitutes a cognizable injury.

69. Every step the defendants take toward enforcing preempted state regulations against the CFTC's regulated entities causes additional disruption to the markets exclusively regulated by the CFTC and thus causes irreparable harm to the CFTC's exclusive jurisdiction, authority, and operations. Incremental enforcement steps send mixed signals to this interconnected market, disrupting their operations. DCMs are forced to guess whether they are held to the standards of the CFTC and CEA, state regulators, or both. Civil enforcement suits and criminal investigations launched by States discourage DCM participation in the market by obfuscating the proper regulatory framework, improperly altering their risk tolerance, and causing unnecessary expense to both DCMs and the CFTC.

70. Because Congress granted the CFTC "exclusive authority" over DCMs, it is not equipped to manage markets that are subject both to the CEA and to a patchwork of state regulations. As a result, defendants' actions undermine CFTC's authority and require additional agency resources to engage in regulatory oversight of these DCMs.

## VII. THE CHALLENGED WISCONSIN STATUTES ARE PREEMPTED AS APPLIED TO COMMODITIES DERIVATIVES CONTRACTS

71. The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary

22

notwithstanding." U.S. Const. art. VI, cl. 2.

72. The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM.  7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Ag. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

73. "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal citation omitted); *see Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (Under the Supremacy Clause, state laws that conflict with federal law are "without effect."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (same); *Time Warner Cable v. Doyle*, 66 F.3d 867, 874 (7th Cir. 1995) ("Congress, in the exercise of the legislative authority granted to it by the Constitution, may preempt state law.")  (citation omitted). "A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir. 2002).

74. "Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake,* 415 F.3d 693, 696 (7th Cir. 2005).  Congress explicitly preempted state regulation of commodity derivatives transactions, vesting the Commission with "exclusive jurisdiction," except as otherwise expressly provided by Congress,

over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). And Congress has repeatedly expanded the CFTC's "exclusive jurisdiction" through continual amendments, most recently to include "transactions involving swaps." *Id*. Congress therefore preempted state regulation of transactions subject to the CFTC's "exclusive jurisdiction," including swaps, and the DCMs that list them.

75. Even without the express language of the CEA preempting state regulation, any state interference in DCM regulation is preempted because Congress "occupied the field" via the CEA and the CFTC and because any attempt at state regulation conflicts with federal law. *See Boomer,* 309 F.3d at 417. In general, state law must give way if "Congress, acting within its proper authority, has determined must be regulated by its exclusive governance" or where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

76. The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets makes clear that Congress intended to occupy the field. A field is preempted from state regulation "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Such is the case here. CEA § 2(a)(1)(A) makes plain that Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

77. Offering event contracts on a DCM cannot, in and of itself, be an activity that is

unlawful under any state law because such an application of state law would conflict with the CEA. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001).

78.     A State applying local gambling laws to federally regulated DCMs also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). To the extent state laws could apply to federally regulated swaps and derivatives, those laws are preempted as applied to those transactions and market participants because complying with both state and federal law would be an impossibility, and because those state laws, as applied, obstruct Congress's clear intent.

79.     Complying with both state regulations and the CEA is impossible because a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal mandate to provide impartial national access. Other state-imposed restrictions on access to markets would similarly make it impossible for the regulated DCMs to comply with federal regulations. The CEA reflects Congress's understanding that commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, and surveillance of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. Complying with fractured state regulations would derail that goal.

80.     State gambling regulations, as applied to DCMs, also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). State gambling laws often require local licensing, fees,

25

enforcement, and specific hardware. Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent. Indeed, the history of the CEA demonstrates repeated efforts by Congress to protect nationwide markets under uniform federal regulation as those markets evolve and as states attempt to limit them.

81. In enacting the CEA and expanding it over time to provide the framework for commodity derivatives markets in the United States, Congress found that commodity derivatives transactions "are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovery prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

82. The CEA "preempts state laws that directly interfere with swaps traded on DCMs." *KalshiEX, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *2 (3d Cir. Apr. 6, 2026). "[S]ports-related event contracts" are defined as "swaps" under the CEA. *Id.* Thus, "the CFTC has exclusive jurisdiction" over "sports-related contracts…traded on a CFTC-licensed DCM." *Id.*

83. Therefore, the federal Commodity Exchange Act which provides the CFTC with "exclusive jurisdiction" over transactions on CFTC Designated Contract Markets, 7 U.S.C. § 2, preempts Wisconsin statutes that purport to prohibit, limit, or condition the listing or trading of event contract swaps on CFTC-Designated Contract Markets.

## VIII. CLAIM FOR RELIEF

### COUNT I — WISCONSIN STATUTE § 945.03 (COMMERCIAL GAMBLING) VIOLATES THE SUPREMACY CLAUSE AS APPLIED TO TRANSACTIONS ON CFTC DESIGNATED CONTRACT MARKETS

84. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

85. Chapter 945.03 of the Wisconsin Statutes prohibits commercial gambling in

26

Wisconsin.

86. Wis. Stat. § 945.01(1) defines a "bet" as "a bargain in which the parties agree that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value specific in the agreement."

87. Wis. Stat. § 945.03(1m)(b) makes anyone who intentionally "[f]or gain, receives, records, or forwards a bet or offer to bet or, with intent to receive, record or forward a bet or offer to bet, possesses facilities to do so" guilty of a Class I felony.

88. Wis. Stat. § 945.03(1m)(c) makes anyone who intentionally "[f]or gain, becomes a custodian of anything of value bet or offered to be bet" guilty of a Class I felony.

89. Wis. Stat. § 945.03(1m)(g) makes anyone who intentionally "[f]or gain, uses a wire communication facility for the transmission or receipt of information assisting in the placing of a bet or offer to bet on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of a bet or offer to bet" guilty of a Class I felony.

90. Wisconsin has brought an action to enjoin a public nuisance based on alleged violations of state criminal statutes.

91. Wis. Stat. § 945.03(1m), as applied to transactions listed, offered, or executed on DCMs, either directly or through FCMs, is field preempted by Congress's grant of broad regulatory authority over this market to the CFTC in the Commodity Exchange Act, *see* generally, 7 U.S.C. § 2.

92. Wis. Stat. § 945.03(1m), as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, either directly or through FCMs, is expressly preempted by the Commodity Exchange Act, 7 U.S.C. §§ 2(a)(1)(A), 16(e).

27

93.     Wis. Stat. § 945.03(1m), as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, either directly or through FCMs, is implicitly preempted because it makes it impossible for regulated DCMs and FCMs to comply with federal law and is obstacle preempted because it thwarts Congress's purpose in granting the CFTC exclusive regulatory authority over this market.

## IX.     RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

1.  That this Court enter a judgment declaring that the challenged provision, or any other state laws pertaining to gambling or placing bets, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, either directly or through FCMs, violates the Supremacy Clause and are therefore preempted, unconstitutional and invalid;

2.  That this Court issue a permanent injunction that prohibits defendants as well as their successors, agents, and employees, from investigating for or enforcing the challenged provisions or any other state laws pertaining to gambling or placing bets, as applied to transactions listed, offered, or executed on CFTC-Designated Contract Markets, either directly or through FCMs;

3.  That this Court award Plaintiffs their costs and fees in this action; and

4.  That this Court award any other relief it deems just and proper.

Dated: April 28, 2026                     Respectfully submitted,


By:  */s/ Alexandra McTague*
Alexandra McTague
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Enforcement & Affirmative Litigation Branch
450 5th Street, N.W., Suite 6400-South
Washington, D.C. 20001
Tel. 202-718-0483
Alexandra.mctague2@usdoj.gov

Attorneys for the United States of America

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St. NW,
Washington, DC 20001
Tiberius.davis@usdoj.gov
202-860-8970

ALEXANDRA McTAGUE
Senior Litigation Counsel
Alexandra.mctague2@usdoj.gov
202-718-0483

Attorneys for the Commodity Futures
Trading Commission

Tyler S. Badgley
        General Counsel
M. Jordan Minot
        Deputy General Counsel
Anne Stukes
        Senior Assistant General Counsel
Carlin Metzger
        Senior Assistant General Counsel
Andrew J. Weisberg
        Senior Assistant General Counsel

U.S. Commodity Futures Trading
Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 209-1087
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
aweisberg@cftc.gov