**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

THE UNITED STATES OF AMERICA and
COMMODITY FUTURES TRADING
COMMISSION,

               Plaintiffs,

               v.

STATE OF WISCONSIN, *et al.*,

               Defendants.

Case No. 2:26-cv-749

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**AND MEMORANDUM OF LAW IN SUPPORT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ............................................................................................................3

    A.  The Commodity Exchange Act provides the regulatory framework for commodity derivatives markets in the United State, including event contract markets.............................................................................................................3

    B.  Wisconsin unlawfully attempts to apply state gambling laws to CFTC-regulated derivative markets............................................................................................7

LEGAL STANDARD........................................................................................................8

ARGUMENT.................................................................................................................8

I.     Plaintiffs have standing...........................................................................................9

II.    Plaintiffs are likely to succeed on the merits ..........................................................11

    A.    Event contracts are "swaps" under the CEA.................................................11

    B.    Wisconsin's gambling laws do not apply to CFTC-regulated swaps ..........................13

    C.    Even if federally regulated swaps are "bets" under Wisconsin law, Plaintiffs are likely to succeed in establishing that federal law preempts state law as applied to commodity derivatives transactions on CFTC-regulated DCMs...............15

        1.  The CEA expressly preempts state law .................................................17

        2.  The CEA occupies the field of derivatives trading regulation, preempting application of state law ..............................................................................19

        3.  Wisconsin's application of its state laws conflicts with the CEA .........................20

III.    The remaining factors favor granting preliminary relief .................................................22

CONCLUSION..............................................................................................................25

i

# TABLE OF AUTHORITIES

Cases

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
977 F.2d 1147 (7th Cir. 1992) ...................................................................................16

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982)...................................................................................................9

*Altria Group, Inc. v. Good,*
555 U.S. 70 (2008)...................................................................................................22

*American Insurance Association v. Garamendi*,
539 U.S. 396 (2003)..................................................................................................23

*American Trucking Associations, Inc. v. City of Los Angeles.*,
559 F.3d 1046 (9th Cir.2009) ..............................................................................23, 24

*Arizona v. United States,*
567 U.S. 387 (2012)....................................................................................10, 16, 19, 21

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015)..................................................................................................23

*Bohrer v. City of Milwaukee,*
635 N.W.2d 816 (Wisc. 2001) ...................................................................................15

*Boomer v. AT & T Corp.,*
309 F.3d 404 (7th Cir. 2002) ..............................................................................16, 19

*Carson v. Milwaukee Produce Co.*,
113 N.W. 393 (Wisc. 1907)........................................................................................17

*Chamber of Com. of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ..................................................................................24

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) ........................................................................................ 17-18

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000)..................................................................................................22

*Effex Cap., LLC v. National Futures Association*,
933 F.3d 882 (7th Cir. 2019)......................................................................................16

*Gade v. National Solid Wastes Mgmt. Association*,
505 U.S. 88 (1992)....................................................................................................16

*Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*,
739 F.2d 466 (9th Cir. 1984) .....................................................................................22

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)............................................................................................................19

*Hoagland v. Town of Clear Lake,*
  415 F.3d 693 (7th Cir. 2005) ..........................................................................................17

*In re Debs*,
  158 U.S. 564 (1895)............................................................................................................9

*Indiana Port Commission v. Bethlehem Steel Corporation*,
  835 F.2d 1207 (1987)........................................................................................................15

*Irwin v. Williar*,
  110 U.S. 499, (1884)........................................................................................................17

*KalshiEx, LLC v. Flaherty*, No. 25-1922,
  2026 WL 924004 (3d Cir. Apr. 6, 2026) ...........................................................2, 12, 19, 20, 23

*KalshiEX LLC v. Johnson*, No. CV-26-01715,
  2026 WL 976055 (D. Ariz. Apr. 10, 2026) ......................................................................15

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980)..............................................................................................16

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021) ................................................................................................8

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)............................................................................................................9

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819)........................................................................................10

*Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982)..........................................................................................................21

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)..........................................................................................................23

*Nken v. Holder*,
  556 U.S. 418 (2009)............................................................................................................8

*Northwest Austin Municipal Utility District Number One v. Holder*,
  557 U.S. 193 (2009)..........................................................................................................15

*Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*,
  327 F.3d 537 (7th Cir. 2003) ...........................................................................................11

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947)..........................................................................................................22

*S.E.C. v. Gaspar*, No. 83 Civ. 3037,
  1985 WL 521 (S.D.N.Y. Apr. 16, 1985)..............................................................................9

iii

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016)...................................................................................................................9

*Stuber v. Hill*,
 170 F. Supp. 2d 1146 (D. Kan. 2001).....................................................................................20

*Time Warner Cable v. Doyle*,
 66 F.3d 867 (7th Cir. 1995) ....................................................................................................16

*United States v. Alabama*,
 691 F.3d 1269 (11th Cir. 2012) .................................................................................10, 22, 23

*United States v. Ekblad*,
 732 F.2d 562 (7th Cir. 1984) ....................................................................................................9

*United States v. Missouri*,
 114 F.4th 980 (8th Cir. 2024) ...................................................................................................9

*United States v. South Carolina*,
 720 F.3d 518 (4th Cir. 2013) ..................................................................................................10

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
 529 U.S. 765 (2000)...................................................................................................................9

*Winter v. Natural Resource Defense Council, Inc.*,
 555 U.S. 7 (2008).......................................................................................................................8

*Wisconsin v. Dahlk*,
 330 N.W.2d 611 (Wisc. Ct. App. 1983) .................................................................................14

*Wisconsin v. KalshiEx, LLC*,
 No. 30703 (Wis. Cir. Ct. Dane Cty. Apr. 23, 2026) ..............................................................14

*Wisconsin Department of Industry v. Gould Inc.*,
 475 U.S. 282 (1986)..................................................................................................................16

Statutes

7 U.S.C. § 1, et seq., CEA § 1, et seq. ...........................................................................................1

7 U.S.C. § 1a(47)(A)(i), CEA § 1a(47)(A)(i) .........................................................................4, 12

7 U.S.C. § 1a(47)(A)(ii), CEA § 1a(47)(A)(ii) ..................................................................3, 11, 12

7 U.S.C. § 1a(47)(A)(iv), CEA § 1a(47)(A)(iv) .........................................................................12

7 U.S.C. § 1a(47)(A)(vi), CEA § 1a(47)(A)(vi) .........................................................................12

7 U.S.C. § 2(a)(1)(A), CEA § 2(a)(1)(A) ...........................................................1, 2, 9, 16, 17, 20

7 U.S.C. § 2(e), CEA § 2(e)............................................................................................................5

7 U.S.C. § 5, CEA § 3 ........................................................................................................5

7 U.S.C. § 5(b), CEA § 3(b)................................................................................................5

7 U.S.C. § 6, CEA § 4 ........................................................................................................5

7 U.S.C. § 6c(b), CEA § 4c(b) ...........................................................................................5

7 U.S.C. § 7, CEA § 5 ........................................................................................................6

7 U.S.C. § 7(d), CEA § 5(d)................................................................................................6

7 U.S.C. § 7a-2(c)(5)(C), CEA § 5c(c)(5)(C) ...................................................................18

7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii), CEA § 5c(c)(5)(C)(i)-(ii) ..............................................18

7 U.S.C. § 7b-3(a), CEA § 5h ............................................................................................5

7 U.S.C. § 13a-1(a), CEA § 6c(a) ...................................................................................3, 9

U.S. Const. art. VI, cl. 2...................................................................................................15

Future Trading Act of 1921,
    Pub. L. No. 67-66, 42 Stat. 187 (1921)...................................................................22

Grain Futures Act of 1922,
    Pub. L. No. 67-331, 42 Stat. 998 (1922)..................................................................22

Commodity Futures Trading Commission Act of 1974,
    Pub. L. 93-463, 88 Stat. 1389 (1974)......................................................................17

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010)...........................................................18

Wisc. Stat. § 409.102(1)(dm)1...........................................................................................2

Wis. Stat. § 945.01.............................................................................................................8

Wis. Stat. § 945.01(1) ......................................................................................................13

Wis. Stat. § 945.01(1)(a)1.......................................................................................2, 13, 14

Wis. Stat. § 945.03(1m)(b)..........................................................................................1, 2, 7

Wis. Stat. § 945.03(c)......................................................................................................1, 7

Wis. Stat. § 945.03(g) .....................................................................................................1, 7

Regulations

17 C.F.R. § 32.2 .................................................................................................................5

Case 2:26-cv-00749-WCG    Filed 05/01/26    Page 6 of 34    Document 6

17 C.F.R. § 35.550 ..........................................................................................................7

17 C.F.R. § 37.3 ..............................................................................................................5

17 C.F.R. § 38.150(a) .......................................................................................................6

17 C.F.R. § 38.150(b) .......................................................................................................6

17 C.F.R. § 38.151(b) .................................................................................................10, 21

17 C.F.R. § 38.200 ...........................................................................................................6

17 C.F.R. § 38.250 ...........................................................................................................6

17 C.F.R. § 38.500 ...........................................................................................................6

17 C.F.R. § 40.2 ...............................................................................................................4

17 C.F.R. § 40.11(a)(1) ...................................................................................................18

17 C.F.R. § 40.11(a)(2) ...................................................................................................18

17 C.F.R. § 48.3 ...............................................................................................................5

Legislative Materials

120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974)
  (Statement of Sen. Curtis)...........................................................................................17

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on
  Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong.,
  2d Sess. 685 (1974) (statement of Sen. Clark)..........................................................18

H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.).........................................................22

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
  *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897 ..............................................................19

S. Rep. No. 95-850, at 111-12 (1978),
  *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11 ........................................................19

H.R. Rep. No. 97-565, at 44-45 & 102-103 (1982),
  *reprinted in* 1982 U.S.C.C.A.N. 3871, 3893-94, 3951-52........................................20

Other Authorities

CFTC Designated Contact Market Products, *available at*
  https;//www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganization
  Products?Organization=CM ...........................................................................................4


CFTC, Futures Glossary: A Guide to the Language of the Futures In*dustry*,

https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
CFTCGlossary/index.htm ................................................................................4, 12

Press Release, Josh Kaul, Att'y Gen. of Wisc., *Wisconsin DOJ Sues To Stop Alleged Illegal
Sports Betting Operations in Wisconsin* (Apr. 23, 20260, https://www.wisdoj.gov/Press
Releases/press-release-sports-betting.pdf ................................................................................7

Case 2:26-cv-00749-WCG    Filed 05/01/26    Page 8 of 34    Document 6

# PRELIMINARY STATEMENT

Plaintiffs United States of America ("USA") and Commodity Futures Trading Commission ("CFTC"), a federal executive agency, seek a preliminary injunction from this Court to halt Defendants' ongoing attempts to assert jurisdiction over federally regulated interstate commodity derivatives markets, thus unconstitutionally intruding on the CFTC's exclusive regulatory jurisdiction and disrupting those federally regulated markets. Defendants ("State" or "Wisconsin") filed civil enforcement actions against CFTC-regulated commodity derivative trading exchanges known as Designated Contract Markets ("DCMs") and brokerages known as Futures Commission Merchants ("FCMs"), which offer event contracts on pursuant to federal regulation under the Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, and CFTC regulations.[1] Wisconsin's lawsuits allege that the five entities are creating public nuisances by allegedly violating Wis. Stat. § 945.03(1m)(b), (c), and (g).

Wisconsin's attempt to apply state gambling laws to federally regulated financial markets violates the Supremacy Clause. The Commodity Exchange Act expressly and implicitly preempts state gambling laws as applied to CFTC-regulated markets and market participants. The CEA provides a comprehensive framework for the regulation of derivatives transactions in the United States and designates the CFTC as the federal agency with "exclusive jurisdiction" over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges.

---

[1] Wisconsin filed civil actions against Coinbase Global, Inc., and Coinbase Financial Markets, Inc. ("Coinbase"); Kalshi, Inc., KalshiEX, LLC, Kalshi Klear, Inc., Kalshi Klear, LLC, Kalshi Trading, LLC ("Kalshi"); Robinhood Derivatives, LLC and Robinhood Securities, LLC ("Robinhood"); Blockratize, Inc. d/b/a Polymarket, QCX, LLC d/b/a Polymarket U.S., QC Clearing, LLC d/b/a Polymarket Clearing ("Polymarket"); and Foris Dax Markets, Inc. and North American Derivatives Exchange, Inc. d/b/a Crypto.com | Derivatives North America ("Crypto.com"). *See* Wisconsin DOJ Sues To Stop Alleged Illegal Sports Betting Operations in Wisconsin, Wis. Dep't. of Justice, (April 23, 2026), https://www.wisdoj.gov/PressReleases/press-release-sports-betting.pdf.

1

7 U.S.C. § 2(a)(1)(A). And the event contracts offered directly by CFTC-regulated DCMs such as Kalshi, Polymarket and Crypto.com, or through FCMs such as Coinbase and Robinhood—including event contracts where the underlying event relates to sports or politics—are "swaps" under the plain meaning of the CEA. See *KalshiEx, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *3 (3d Cir. Apr. 6, 2026) ("Because Kalshi's sports-related event contracts are traded on a CFTC-licensed DCM and depend on event outcomes associated with economic consequences, they fit within the Act's definition of 'swaps' subject to the CFTC's jurisdiction.").

Because the event contracts offered by DCMs and FCMs are swaps, Wisconsin's prohibition on "bet[s]" does not apply to those contracts. *See* Wisconsin Stat. § 945.03(1m). The definition of "bet" in Wisconsin law expressly excludes "[b]ona fide business transactions which are valid under the law of contracts," including "[c]ontracts for the purchase or sale at a future date of securities or other commodities." Wisc. Stat. § 945.01(1)(a)1. And Wisconsin's Uniform Commercial Code defines "commodity contract" to include "a commodity futures contract, an option on a commodity futures contract, a commodity option, or another contract if the contract or option is . . . [t]raded on or subject to the rules of a board of trade that has been designated as a contract market for such a contract pursuant to federal commodities laws." Wisc. Stat. § 409.102(1)(dm)1. Because event contracts are traded on CFTC-regulated DCMs they are "subject to the rules of a board of trade . . . designated as a contract market . . . [under] federal commodities laws" and are specifically excluded from Wisconsin's definition of "bets." *Id.*; Wisc. Stat. § 945.01(1)(a)1. Wisconsin cannot apply its gambling laws to CFTC-regulated markets.

Even if Wisconsin law was not so limited, those state laws would be preempted as applied to transactions on CFTC-regulated DCMs. Congress conferred on the CFTC "exclusive jurisdiction" over, among other things, swaps traded on DCMs. 7 U.S.C. 2(a)(1)(A). What is

2

more, Congress implicitly preempted application of state laws to these markets by occupying the field via the CEA's comprehensive regulatory scheme and attempts to apply state laws to regulate those markets stand as obstacles to the accomplishment of Congress's purposes.

Subjecting CFTC-regulated markets to a patchwork of 50 state regulations is precisely what Congress sought to avoid with the CEA, including with decades of amendments to the Act that enhanced the CEA's preemptive effect. Wisconsin's broad assertion of its authority to regulate transactions as gambling lacks any limiting principle—Wisconsin, by its logic, could regulate not just sports event contracts, but event contracts that have long been traded uncontroversially on CFTC-regulated DCMs, like contracts on the weather or agricultural production.

This Court should enjoin Wisconsin from attempting to apply its inapplicable state gambling laws to CFTC-regulated DCMs.

## BACKGROUND

A. **The Commodity Exchange Act provides the regulatory framework for commodity derivatives markets in the United States, including event contract markets**

The CEA provides a comprehensive framework that governs transactions in United States commodity derivatives markets. The CFTC is the federal executive agency that administers the CEA, enforces its provisions in federal courts,[2] and regulates derivatives markets. A "derivative" is a financial instrument, such as a future, option, or swap, for which the price is directly dependent upon—that is, "derived from"—the value of something else, such as an agricultural or financial

---

[2] The CFTC has statutory authority to "bring an action in . . . [a] district court . . . to enjoin . . . or enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery or any swap." 7 U.S.C. § 13a-1(a).

3

commodity.[3]  An "event contract" is a type of swap that provides for payment that is "dependent on the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).[4]  For example, an event contract might be based on the occurrence, nonoccurrence, or extent of an occurrence of a weather event such as snowfall or rainfall, a Federal Reserve Board rate increase, a particular election result, or the result of a sports event.

At least eight DCMs have collectively self-certified more than 3,000 event based contracts with the CFTC pursuant to CFTC Rule 17 C.F.R. § 40.2, with a notable increase in such filings during the last two years.[5]  Importantly, many of these contracts are tied to non-sport outcomes involving measurable commodity indicators, including cryptocurrency price levels and related indices, GDP releases, benchmark interest-rate decisions, election outcomes, temperature forecasts, electricity usage, and the price movements of precious metals. *Id*.  These event contracts rest on objectively measurable outcomes no less than sports event contracts.

The CEA and CFTC regulations establish important protections for derivatives markets, market participants, and the public by creating uniform regulations of nationwide—and often international—markets.  The CEA's purpose is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all

---

[3]  CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[4]  Depending on their structure, event contracts may also satisfy other prongs of the swap definition—for example, as "option[s] of any kind" that are "based on the value" of an index, quantitative measure, or other financial or economic interest.  7 U.S.C. § 1a(47)(A)(i).

[5]  See CFTC Designated Contact Market Products, available at https://www.cftc.gov /IndustryOversight/Industry Filings/TradingOrganizationProducts?Organization=CM.

4

transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).

Transactions subject to the CEA "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5. In other words, Congress specifically identified a public interest in federal regulation of derivatives markets because those markets provide a means to "hedge" economic risks. "Hedging" is generally understood to be the use of derivatives to manage the various price risks incidental to commercial activity.[6] Like securities markets, the commodities derivatives markets also include "speculators" who trade to profit from price movements. Speculators are important because they help ensure that hedgers can find counterparties with whom to trade.

Many derivatives are required to be traded on a designated contract market, or DCM, the statutory term for a derivatives exchange registered with, and regulated by, the CFTC. Futures contracts must be traded on a DCM or a registered foreign board of trade (see 7 U.S.C. § 6 and 17 C.F.R. § 48.3); many swaps must be traded on a registered swap execution facility or a DCM (see 7 U.S.C. §§ 2(e), 7b-3(a), and 17 C.F.R. § 37.3); and commodity options must likewise be conducted on a DCM (see 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2).

---

[6] For instance, airlines that need to buy jet fuel in the foreseeable future might manage the risk that the price will increase by entering into a derivative contract, *e.g.* a futures contract, to hedge against that risk. It would take a "long" position, *i.e.*, a futures contract that will increase in value if the price of the airline's fuel increases. On the other hand, a fuel supplier might manage the risk that the price of oil will decline by taking a "short" position, *i.e.*, a futures contract that will increase in value if the price of fuel goes down.

5

DCMs are national boards of trade or exchanges that operate under the regulatory oversight of the CFTC pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  The CFTC designates a board of trade as a contract market through a formal application process through which an applicant must demonstrate its ability to comply with detailed statutory requirements called "core principles."  7 U.S.C. § 7(d).  These core principles require, for example, that DCMs:

- establish, monitor, and enforce compliance with the rules of the market including access requirements, the terms and conditions of any contracts to be treaded, and rules prohibiting abusive trade practices, 17 C.F.R. § 38.150(a) (Core Principle 2),

- have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the market, 17 C.F.R. § 38.150(b) (Core Principle 2),

- list only contracts that are not readily susceptible to manipulation, 17 C.F.R. § 38.200 (Core Principle 3),

- have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including methods for conducting real-time monitoring of trading and comprehensive and accurate trade reconstructions, 17 C.F.R. § 38.250 (Core Principle 4),

- provide a competitive, open and efficient market and mechanism for executing transactions that protects the price discovery process, 17 C.F.R. § 38.500 (Core Principle 9),

- maintain rules and procedures to provide for the recording and safe storage of

6

all identifying trade information in a manner that enables the contract market to use the information to assist in the prevention of customer and market abuses and to provide evidence of any violations of the rules of the contract market, 17 C.F.R. § 35.550 (Core Principle 10).

Today 25 exchanges in the United States have active designations from the CFTC to operate as a contract market. These DCMs include Kalshi, Polymarket, and Crypto.com.

### B. Wisconsin unlawfully attempts to apply state gambling laws to CFTC-regulated derivatives markets

One week ago, the State of Wisconsin filed civil enforcement actions against CFTC regulated entities Kalshi, Polymarket, Crypto.com, Coinbase and Robinhood, alleging that these entities are creating public nuisances by allegedly violating Wis. Stat. § 945.03(1m)(b), (c), and (g). Wisconsin seeks: (a) declarations that Coinbase, Kalshi, Robinhood, Polymarket, and Crypto.com are violating Wis. Stat. § 945.03(1m)(b), (c), and (g) and causing a public nuisance; and (b) preliminary and permanent injunctions prohibiting Coinbase, Kalshi, Robinhood, Polymarket, and Crypto.com from offering sports-related event contracts for trading in Wisconsin. In a press release announcing the lawsuits, Attorney General Joshua Kaul claimed that Coinbase, Kalshi, Robinhood, Polymarket, and Crypto.com are "facilitati[ng] . . . illegal sports betting, a form of unlawful commercial gambling, in Wisconsin."[7]

Defendants assert that Wisconsin law permits defendants to ban and criminalize markets over which Congress has granted "exclusive jurisdiction" to regulate to the CFTC. Defendants seek to prohibit CFTC-regulated entities from operating in Wisconsin and from offering Wisconsin customers access to event contracts. Wisconsin's attempt to criminalize

---

[7] Press Release, Josh Kaul, Att'y Gen. of Wisc., Wisconsin DOJ Sues To Stop Alleged Illegal Sports Betting Operations in Wisconsin (Apr. 23, 20260, https://www.wisdoj.gov/Press Releases/press-release-sports-betting.pdf.

7

and shut down federally regulated markets intrudes on the exclusive federal scheme Congress designed to oversee national swaps markets. Moreover, under a plain reading of Wisconsin's gambling law, federally regulated commodity derivative contracts are excepted from Wisc. Stat. § 945.01. Even if that were not the case, federal law preempts application of Wisconsin law to regulate CFTC-regulated exchanges, which are subject to the exclusive jurisdiction of the CFTC.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the federal government is a party, the third and fourth *Winter* factors—balance of equities and public interest—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A finding of irreparable harm absent an injunction is a threshold requirement for granting a preliminary injunction. *E.g.*, *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021).

## ARGUMENT

This Court should enter a preliminary injunction because Wisconsin gambling laws are inapplicable as applied to federally regulated swaps listed on DCMs, and even if such contracts were not excepted, the CEA preempts Wisconsin law as applied to swaps traded on DCMs. Wisconsin's aggressive enforcement of its inapplicable, and in any event preempted, state laws—including through its threats of criminal prosecution and use of civil enforcement suits to intimidate federally regulated entities and, ultimately, disrupt the operation of federally regulated markets—causes irreparable harm to the federal plaintiffs.

8

## I. Plaintiffs Have Standing

Standing requires Plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, Plaintiffs must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs have at least two legally protected "sovereign injuries" that Defendants' conduct have invaded. *See generally In re Debs*, 158 U.S. 564, 586 (1895); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). First, the Supreme Court stated that "[i]t is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). For example, "when the SEC brings a civil enforcement action or the United States brings a criminal action under the securities laws, 'issues such as standing . . .' are irrelevant." *S.E.C. v. Gaspar*, No. 83 Civ. 3037, 1985 WL 521, at *16 (S.D.N.Y. Apr. 16, 1985). This is true even though the United States is not injured in a traditional sense when it brings a criminal or civil enforcement action to vindicate federal law and the public interest. *See, e.g., United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984) ("The United States has standing to seek relief from actual or threatened interference with the performance of its proper governmental functions."); *United States v. Missouri*, 114 F.4th 980, 984-85 (8th Cir. 2024) ("The United States has a legally protected interest in enforcing federal law."). As noted, the CFTC has the "exclusive jurisdiction" to regulate DCMs, 7 U.S.C. § 2(a)(1)(A), and can likewise bring civil suits to enforce its authority, 7 U.S.C. § 13a-1(a). Defendants are violating this exclusive

9

jurisdiction and the Supremacy Clause by stepping into a realm that Congress expressly and implicitly reserved solely for the CFTC.

Second, and relatedly, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 361 (1819) ("states are prohibited from passing any acts which shall be repugnant to a law of the United States."). Indeed, the United States regularly brings preemption lawsuits to invalidate state laws that are contrary to federal law. *See, e.g., id.; Arizona v. United States*, 567 U.S. 387, 394 (2012); *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013). Here, Wisconsin's attempts to regulate DCMs undermines and conflicts with the CFTC's exclusive and preemptive jurisdiction. See Decl. of Joshua Beale, attached. It thus undermines the agency's regulatory authority, the uniformity of federal law, and can subject DCMs to a patchwork of 50 state regulations contrary to Congress's goals. In doing so, Wisconsin at least directly violates and undermines the CFTC's regulation requiring "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). Wisconsin's disruption of this regulatory authority constitutes a cognizable injury.

Even if more was required, however, compromising the CEA's regulatory scheme via a patchwork of state regulation makes the agency's task of uniformly regulating DCMs much more difficult. *See* Decl. of Joshua Beale, attached. Because Congress granted the CFTC "exclusive authority" over DCMs, it is not equipped to manage markets that are subject both to the CEA and to a patchwork of state regulations. As a result, Defendants' actions undermine CFTC's authority and require additional agency resources to engage in regulatory oversight of these DCMs. That is a classic Article III injury.

These injuries are caused by Defendants' attempts to regulate CFTC regulated DCMs under state laws in violation of CFTC's "exclusive jurisdiction" and the Supremacy Clause. An injunction against Defendants' efforts to apply its laws to those federally regulated DCMs would redress the Plaintiffs' sovereign injury.

## II.     Plaintiffs are likely to succeed on the merits

Plaintiffs are likely to succeed on the merits of their claim that Wisconsin gambling laws may not be applied to regulate CFTC-regulated DCMs. Event contracts that are traded on DCMs are "swaps" under the plain meaning of the CEA and therefore fall under the "exclusive jurisdiction" conferred on the CFTC by Congress. Because swaps are "bona fide" business transactions, they are explicitly excepted from Wisconsin's gambling laws, and those laws may not be used to regulate swaps traded on DCMs. Even if Wisconsin's laws could reach transactions traded on DCMs, the application of those state laws is expressly and implicitly preempted by the CEA.

### A.     Event contracts are "swaps" under the CEA

Event contracts are swaps as defined by the CEA.[8] "[I]n all statutory interpretation cases," the analysis must "begin with the statutory language." *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 543 (7th Cir. 2003). The Act defines "swap" to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or

---

[8] Congress also currently considers event contracts traded on DCMs to be swaps. On April 30, 2026, the Senate changed its rules to add a provision barring members from participating in "prediction market[s]" and describing those transactions as "swap[s] ... as defined in section 1a of the Commodity Exchange Act . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of a specific event or contingency." S. Res. 708, 119th Cong. (2026). The resolution specifies that it does not "change the definitions of any of the types of contracts" and merely reflects current CEA definitions. *Id*.

11

contingency *associated with a potential* financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). Event contracts, including sports event contracts, are settled based on the occurrence or non-occurrence of a specified future event, like the occurrence of a weather event or the outcome of an election or sporting event. And those occurrences are "associated with [] potential financial, economic, or commercial consequence[s]"—a storm affects shipping and crops; an election affects tax and spending policy; and a sporting event affects ticket and merchandise sales, advertising, brand endorsements, vendors, lodging businesses, and food and beverage services. *Id.*; *see also KalshiEx*, 2026 WL 924004, at *3 (listing similar examples).

Event contracts often also qualify as binary options under the CEA, which are a "option[s] whose payoff is either a fixed amount or zero."[9] As binary options, event contracts are swaps under 7 U.S.C. § 1a(47)(A)(i), which defines "swap," to include "any agreement, contract, or transaction . . . that is a[n] . . . option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . quantitative measures, or other financial or economic interests or property of any kind."[10]

Event contracts based on sports or elections also implicate "potential financial, economic, or commercial consequence[s]" under the CEA. 7 U.S.C. § 1a(47)(A)(ii). As the Third Circuit held, a sports event affects "numerous . . . stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *KalshiEX*, 2026 WL 924004, at *3.

Many of the stakeholders to a sport event may wish to hedge against a team's or participant's performance. *See id.* And the same is true for political event contracts: any number

---

[9] CFTC, Futures Glossary: A Guide to the Language of the Futures Industry,, https://www.cftc.gov/LearnAndProtect/AdvisoriesAnd Articles/CFTCGlossary/index.htm#B.

[10] *See also* §§ 1a(47)(A)(iv) (including transactions "commonly known to the trade as swaps") and (vi) ("any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)").

12

of stakeholders may want to hedge against an expected policy change. The only difference between a sports or political event contract and the types of event contracts on the weather or corn production that have traded on DCMs for decades is the underlying event. Carving out sports or political event contracts from the CEA's definition of "swap," would destabilize those previously uncontroversial markets, potentially subjecting them to a patchwork of state gambling regulations. By contrast, adhering to the plain text of the CEA does nothing to limit Wisconsin's existing tribal gambling. The plain text reading of the CEA is also the least disruptive to both federal futures regulation and the typical application of Wisconsin's gambling laws.

### B. Wisconsin's gambling laws do not apply to CFTC-regulated swaps

This Court need not decide whether any Wisconsin law is preempted because Wisconsin's gambling laws, on their face, do not apply to CFTC-regulated derivatives transactions. To fall under the Wisconsin prohibition on gambling, a transaction must meet the definition of a "bet" under Wis. Stat. § 945.01(1). Swaps traded on CFTC-regulated DCMs do not meet that definition. The statute explicitly carves out regulated financial instruments, such as federally regulated derivatives contracts, to ensure that legitimate commerce is not stifled by anti-gambling statutes. Under Wis. Stat. § 945.01(1)(a)1, the definition of "bet" specifically excludes "[b]ona fide business transactions which are valid under the law of contracts including without limitation . . . [c]ontracts for the purchase or sale at a future date of securities or other commodities." Wisc. Stat. § 945.01(1)(a)1.

The legislature's inclusion of the phrase "without limitation" demonstrates an intent to provide a broad exception for various financial instruments, including commodity derivative instruments traded on exchanges regulated by the CFTC. Because the sports event contracts are swaps, a type of commodity derivative that must be traded on a CFTC-regulated DCM when

13

offered to retail participants, they are not "bets" by definition; they are federally authorized commercial instruments. They fall directly into the Wisc. Stat. § 945.01(1)(a)1's express safe harbor for "commodities" transactions.

Moreover, swap contracts that trade on CFTC-regulated DCMs are contracts under Wisconsin law. Wisconsin's Uniform Commercial Code defines "commodity contract" to include "a commodity futures contract, an option on a commodity futures contract, a commodity option, or another contract if the contract or option is . . . [t]raded on or subject to the rules of a board of trade that has been designated as a contract market for such a contract pursuant to federal commodities laws." Wisc. Stat. § 409.102(1)(dm)1. Swap contracts that trade on DCMs are thus valid under Wisconsin contract law and constitute "bona fide" transactions. That is enough to meet the plain language of the exception in Wisc. Stat. § 945.01(1)(a)1.

In its lawsuits against the CFTC-regulated markets, Wisconsin asserts that event contracts trading on federally regulated DCMs are merely disguised "bets" and that describing these transactions as "bona fide business transactions" is a mere "fig leaf." *See, e.g.,* Complaint ⁋ 4, *Wisconsin v. Kalshi, Inc.*, Civil No. 30703 (Wis. Cir. Ct. Dane Cty. April 23, 2026). But as explained above, pp. 12-13, 18-19, *supra*, sports event contracts traded on CFTC-regulated markets have utility in hedging and price discovery, and sports-related swaps implicate potential financial, economic, or commercial consequences. In contrast to the facts of *Wisconsin v. Dahlk*, 330 N.W.2d 611, 618 (Wisc. Ct. App. 1983), where "[n]o contracts [we]re entered for the purchase or sale of securities or commodities," and the scheme was "predominantly controlled by chance," here, the contracts at issue are traded on federally regulated, national financial markets. The State's theory that sports-related swaps trading on CFTC-regulated DCMs are not "bona fide business transactions" falls afoul of the statutory language and defies the established construction of Wisc.

Stat. 945.01 set in *Bohrer v. City of Milwaukee*, which held that, where a party adheres to the statutory criteria of an exception in Wisc. Stat. 945.01, the State cannot prevail by "reading additional, unstated requirements into the statute."  635 N.W.2d 816, 822 (Wisc. Ct. App. 2001).

Accordingly, federally regulated swaps satisfy the requirement of a valid, enforceable contract under Wis. Stat. § 945.01(1)(a)1, and are not "bets."  Wisconsin statutes prohibiting the placing of "bets" do not apply.  Resolving the motion on this ground has the additional benefit of refraining from deciding a constitutional question when the matter may be resolved on statutory grounds, consistent with the doctrine of constitutional avoidance.  *E.g., Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009) ("Our usual practice is to avoid the unnecessary resolution of constitutional questions.); *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir. 1987) ("We avoid deciding constitutional questions if the case may be disposed of on other grounds presented.").

**C. Even if federally regulated swaps are "bets" under Wisconsin law, Plaintiffs are likely to succeed in establishing that federal law preempts state law as applied to commodity derivatives transactions on CFTC-regulated DCMs**

Should it reach the issue, this Court should conclude that the CEA preempts State law as applied to event contracts traded on CFTC-regulated DCMs.  *KalshiEX LLC v. Johnson*, No. CV-26-01715, 2026 WL 976055, at \*2 (D. Ariz. Apr. 10, 2026) (enjoining Arizona from enforcing state gambling law against "event contracts listed on CFTC-regulated DCMs.").  The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

The United States and its agencies are entitled to a preliminary injunction against a State when federal plaintiffs establish a likelihood to succeed in establishing state law is preempted.

15

*Arizona,* 567 U.S. at 394 (upholding a preliminary injunction against an Arizona immigration law because the federal government occupies the field of immigration). Where Congress makes "a single sovereign responsible for maintaining a comprehensive and unified system" of regulation, allowing states to regulate the same field "'detract[s] from the "integrated scheme of regulation" created by Congress.'" *Id.* at 401–02 (quoting *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 288-89 (1986)).

The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM. 7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *American Ag. Movement v. Board of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

"[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal citation omitted); *Time Warner Cable v. Doyle*, 66 F.3d 867, 874 (7th Cir. 1995) ("Congress, in the exercise of the legislative authority granted to it by the Constitution, may preempt state law." (citation omitted)). "A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir. 2002). Wisconsin's laws as applied to federally regulated DCMs are expressly and implicitly preempted.

16

### 1.	The CEA expressly preempts state law

"Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake,* 415 F.3d 693, 696 (7th Cir. 2005).  Congress explicitly preempted state regulation of commodity derivatives transactions, vesting the Commission with "exclusive jurisdiction," except as otherwise expressly provided by Congress, over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).

This "exclusive jurisdiction" provision was first enacted by the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974"). Preemption was the primary goal of the "exclusive jurisdiction" provision.  After decades of amendment and refinement of the CEA, Congress chose to expressly preempt any concurrent state regulation of the markets at issue in this case by conferring on the CFTC "exclusive jurisdiction" to regulate "transactions involving swaps" traded on CFTC-regulated DCMs.  7 U.S.C. § 2(a)(1)(A).  Indeed, potentially limiting language was stricken from the statute "to assure that Federal preemption is complete."  120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis).  Preemption of state law was necessary because, for decades, states had attempted to apply state gambling laws to derivatives trading.  By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation. But many states, including Wisconsin, prohibited futures trading as a form of gambling.  *See, e.g., Carson v. Milwaukee Produce Co.*, 113 N.W. 393, 395 (Wisc. 1907) (remanding for a new trial on whether grain contracts on a board of trade were void as a matter of law because "betting on future prices" amounted to unlawful gambling contracts); *Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16

17

N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain"). Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

As financial derivatives markets have developed and grown, Congress has steadily expanded the CFTC's jurisdiction to include commodity swaps and event contracts. In 2010, Congress amended the CEA to add "transactions involving swaps" to the CFTC's § 2(a)(1) exclusive jurisdiction. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A). In the same legislation, Congress emphasized the CFTC's exclusive jurisdiction over event contracts by adding the "Special Rule," CEA § 5c(c)(5)(C) to the Act. *See* 7 U.S.C. § 7a-2(c)(5)(C). In § 5c(c)(5)(C), Congress granted the CFTC specific oversight and prohibitory authority over event contracts by providing that the CFTC "may determine" event contracts involving certain categories "are contrary to the public interest" and may not be listed on CFTC-regulated markets. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). CFTC Rule 40.11 implements the Special Rule by prohibiting DCMs from offering event contracts "that involve[], relate[] to, or reference[] terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). The CFTC is empowered by Congress to prohibit DCMs from offering event contracts that it determines "to be contrary to the public interest." Id. § 40.11(a)(2). By creating a specific public interest review process, Congress clearly signaled that these contracts are within the CFTC's exclusive regulatory purview, not the States'.

## 2. The CEA occupies the field of derivatives trading regulation, preempting application of state law

Even without the express language of the CEA preempting state regulation, state laws prohibiting or purporting to regulate transactions listed by or executed on CFTC-regulated DCMs are preempted because Congress "occupied the field" of regulation of event contracts traded on CFTC-regulated DCMs. *See KalshiEX*, 2026 WL 924004, at *4; *Boomer,* 309 F.3d at 417. In general, state law must give way if "Congress, acting within its proper authority, has determined [that a category of conduct] must be regulated by its exclusive governance" or where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

When Congress amended CEA § 2(a)(1) in 1974 to give the CFTC "exclusive jurisdiction" over futures transactions, it did so with the intent that the CEA would "preempt the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

Over the years, amendments to the CEA repeatedly reinforced the CFTC's exclusive jurisdiction over the field of futures derivatives trading. In 1978, proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also underscored the importance of the CFTC's exclusive jurisdiction over commodity derivatives,

19

citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.* When amending the CEA in 1982, Congress "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recognizing the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." H.R. Rep. No. 97-565, at 44-45 & 102-103, *reprinted in* 1982 U.S.C.C.A.N. at 3893-94, 3951-52.

A field is preempted from state regulation "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets makes clear that Congress intended to occupy the field. With 7 U.S.C. § 2(a)(1)(A), Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

3.      **Wisconsin's application of its state laws conflicts with the CEA**

Offering event contracts on a DCM cannot, in and of itself, be an activity that is unlawful under any state law because such an application of state law would conflict with the CEA. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001); *see also KalshiEX*, 2026 WL 924004, at *5 ("[C]onflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed DCMs.").

20

A State applying local gambling laws to federally regulated DCMs "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). The CEA presents a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). State gambling laws often require local licensing, fees, enforcement, and specific hardware. Here, Wisconsin attempts a total ban of CFTC-regulated event contracts. Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent in these complex markets. Indeed, the history of the CEA demonstrates repeated efforts by Congress to protect nationwide markets under uniform federal regulation as those markets evolve and as states attempt to limit them.

What's more, complying with both state and federal law regulating event contracts traded on CFTC-regulated DCMs would be impossible because a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, as Wisconsin attempts here, the DCM cannot fulfill its federal mandate to provide impartial national access. Other state-imposed restrictions on access to markets would similarly make it impossible for the regulated DCMs to comply with federal regulations. The CEA reflects Congress's understanding that commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, and surveillance of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. Complying with fractured state regulations would derail that goal.

Congress has consistently chosen centralized, federal oversight and regulation of derivatives markets, recognizing the negative effects of a patchwork of state regulation even in the

21

predecessor statutes to the current CEA. *See* Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921); Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States"). Congress's "clear and manifest purpose" was indeed to preempt these historic police powers. *Altria Grp., Inc.*, 555 U.S. at 77 (noting "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The plain language of the text, underscored by the consistent legislative history to preempt states from applying 50 state requirements on national markets, indicates this "clear and manifest purpose" to preempt state police powers.

### III. The remaining factors favor granting preliminary relief

Absent an injunction, the United States and the CFTC will suffer irreparable harm. Irreparable harm necessarily results from the enforcement of an unconstitutional state law. *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often alone constitute irreparable harm."). And the United States suffers irreparable harm "when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *Alabama*, 691 F.3d at 1301. The federal government's ability to enforce its policies and achieve its objectives will be undermined by the state's enforcement of statutes that interfere with federal law. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379-80 & n. 14 (2000). "The ability to sue to enjoin unconstitutional

actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The United States and the CFTC seek to protect their distinct interests in preventing a State from nullifying federal law and evading Congress's intent and direction in the CEA.

Wisconsin seeks not only to ban CFTC-regulated entities but also threatens to apply its criminal law to them for trading in markets in compliance with federal law. Using civil penalties to shut down CFTC-regulated markets and alleging that market participants are criminals increases the risk to companies like Kalshi, Polymarket, Crypto.com, Coinbase and Robinhood in complying with federal law, generally serves to disrupt the markets that the CFTC is tasked with regulating. There is no remedy at law for such an injury. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The likelihood of irreparable harm to the interests of the United States and the CFTC thus warrants preliminary relief. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (enjoining permanently the enforcement of a state statute that is preempted by federal law because it interferes with the federal government's ability to enforce its policies); *Crosby*, 530 U.S. at 372, 379-80 (same).

The public interest and equities prongs merge when the United States is a party because "[f]rustration of federal statutes and prerogatives are not in the public interest," and where a state law is preempted, the State is not "harm[ed] from . . . nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301. As the Third Circuit recently held in a nearly identical case, allowing a state to enforce a state law in violation of the Supremacy Clause is neither equitable nor in the public interest. *See KalshiEx, LLC*, 2026 WL 924004 at *17; *see also American Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1059-60 (9th Cir. 2009). Wisconsin's actions to enforce its

gambling laws as applied to event contracts trading on CFTC-regulated exchanges interferes with federal policy as set out by Congress. A preliminary injunction would allow the federal government to continue to pursue federal priorities, which are inherently in the public interest, until a final judgment is reached in this case. *American Trucking*, 559 F.3d at 1059-60.

Preserving the status quo through a preliminary injunction is less harmful than allowing state laws that are likely preempted by federal law to be enforced. See *Id.* There is no public interest in Wisconsin's enforcement of preempted laws. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). Entering a preliminary injunction would both protect the federal government from irreparable harm and would preserve the status quo while the Court considers the merits.

*     *     *

**CONCLUSION**

Wisconsin's gambling laws are inapplicable, and even if federally regulated event contracts could be construed as falling under Wisconsin's gambling laws, such laws are preempted as applied to event contracts traded on CFTC-regulated DCMs. The United States and the CFTC respectfully ask this court to enter a preliminary injunction prohibiting Wisconsin from applying its laws against CFTC-regulated entities offering event contracts.

Dated: May 1, 2026

By: /s/ Alexandra McTague
Alexandra McTague
NY Bar No. 4342911

*Attorneys for the United States of America*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St. NW,
Washington, DC 20001
Tiberius.davis@usdoj.gov
202-860-8970

ALEXANDRA McTAGUE
Senior Litigation Counsel
Alexandra.mctague2@usdoj.gov
202-718-0483

Respectfully submitted,

By: /s/ Anne W. Stukes
Anne W. Stukes
D.C. Bar No. 469446

*Attorneys for the Commodity Futures Trading Commission*

Tyler S. Badgley, General Counsel
M. Jordan Minot, Deputy General Counsel
Anne W. Stukes, Senior Assistant General Counsel
Carlin Metzger, Senior Assistant General Counsel
Andrew Weisberg, Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Tel: (202) 418-5127
Fax: (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
aweisberg@cftc.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of May 2026, I caused the foregoing Plaintiffs'

Motion for Preliminary Injunction and Memorandum of Law in Support to be served on all

counsel of record via this Court's CM/ECF system.


/s/ Anne W. Stukes

26