|  |  |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF WISCONSIN, *et al.*,<br><br>Defendants. | Case No. 2:26-cv-00749-WCG |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................. 2

I.      Wisconsin's usurpation of the Commission's jurisdiction causes an injury in fact ........... 2

II.     Plaintiffs are likely to succeed on the merits ..................................................... 2

        A.   The Court should give the text its best reading............................................ 2

        B.   The Commission's exclusive jurisdiction over swaps precludes state interference ... 4

        C.   Event contracts are swaps ..................................................................... 11

III.    The balance of harms favors a preliminary injunction ..................................... 15

CONCLUSION ................................................................................................................ 15

i

# TABLE OF AUTHORITIES

**Cases**

*American Agric. Movement, Inc. v. Bd. of Trade of Chicago*,
977 F.2d 1147 (7th Cir. 1992) ...................................................................................... 4, 5

*Bufkin v. Collins*,
604 U.S. 369 (2025) .......................................................................................................... 13

*Carson v. Milwaukee Produce Co.*,
113 N.W. 393 (Wis. 1907) ................................................................................................ 4

*Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*,
162 F.4th 631, 641 n.5 (6th Cir. 2025) ........................................................................ 3

*CFTC v. Trade Exch. Network Ltd.*,
117 F. Supp. 3d 29 (D.D.C. 2015) ................................................................................ 14

*Dec v. Mullin*,
171 F.4th 940 (7th Cir. 2026) ........................................................................................ 13

*Effex Cap., LLC v. National Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019) .............................................................................. 4, 5, 6, 8

*Ho-Chunk Nation v. Kalshi Inc.*,
2026 WL 1284077 (W.D. Wis. May 11, 2026) ........................................................ 10

*KalshiEX LLC v. CFTC*,
2024 WL 4164694 (D.D.C. Sept. 12, 2024) ................................................................ 9

*Kalshiex LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) .................................................... 11, 12

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ................................................................................. passim

*KalshiEX, LLC v. Johnson*,
2026 WL 1223373 (D. Ariz. May 5, 2026) ........................................................... 6, 11

*KalshiEX, LLC v. Schuler*,
2026 WL 1295806 (6th Cir. Apr. 24, 2026) ................................................................ 5

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......................................................................................................... 2

*Leist v. Simplot*,
   638 F.2d 283 (2d Cir. 1980) ................................................................................. 5

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024).............................................................................................. 2

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982).............................................................................................. 10

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992).............................................................................................. 15

*Puerto Rico v. Franklin California Tax-free Tr.*,
   579 U.S. 115 (2016).............................................................................................. 2

*Staffing Servs. Ass'n of Illinois v. Flanagan*,
   720 F. Supp. 3d 627 (N.D. Ill. 2024) .................................................................. 15

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ........................................................................... 15

*United States v. California*,
   173 F.4th 1060 (9th Cir. 2026) ............................................................................ 15

*Utility Air Reg. Grp. v EPA*,
   573 U.S. 302 (2014).............................................................................................. 3

*Wells Fargo Bank, Nat'l Ass'n v. Lake of the Torches Economic Development Corp.*,
   658 F.3d 684 (7th Cir. 2011) ............................................................................... 5

*West Virginia v. EPA*,
   597 U.S. 697 (2022).............................................................................................. 3

*Wisconsin v. Kalshi, Inc.*,
   No. 3:26-cv-00378, (W.D. Wis. June 9, 2026)................................................ 1, 11

*Wyeth v. Levine*,
   555 U.S. 555 (2009).............................................................................................. 11

Statutes

7 U.S.C. § 13a-2.................................................................................................... 5

7 U.S.C. § 16(e) .................................................................................................... 6, 7, 8

7 U.S.C. § 1a(19)(iv).............................................................................................. 14

Case 2:26-cv-00749-WCG   Filed 06/16/26   Page 4 of 23   Document 36

7 U.S.C. § 1a(47)(A) ................................................................................................ 11, 13, 14

7 U.S.C. § 2(a)(1)(A) ................................................................................................ 4, 5, 6

7 U.S.C. § 2(c) .............................................................................................................. 7

7 U.S.C. § 2(d) .............................................................................................................. 8

7 U.S.C. § 2(f) ............................................................................................................... 7

7 U.S.C. § 2(g) .............................................................................................................. 7

7 U.S.C. § 27–27f ......................................................................................................... 7

7 U.S.C. § 5(a) ............................................................................................................. 10

7 U.S.C. § 6(c) .............................................................................................................. 7

7 U.S.C. § 7(a) ............................................................................................................. 10

7 U.S.C. § 7a-2 .............................................................................................. 9, 10, 11, 12

25 U.S.C. § 2703(6) ...................................................................................................... 5

31 U.S.C. § 5362(1) .......................................................................................... 2, 10, 14

Wis. Stat. § 945.01(1)(a)1 ............................................................................................ 3

## Other Authorities

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*,
    13 Va. L. Bus. Rev. 1 (2019) ................................................................................ 7, 8

Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk
    Management*, InGame (Oct. 22, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-
    management/. ......................................................................................................... 14

*Event*, Webster's II New College Dictionary (3d ed. 2025) ........................................ 12

## Regulations

17 C.F.R. § 38.3 ........................................................................................................... 10

17 C.F.R. § 38.4 ........................................................................................................... 10

17 C.F.R. § 38.151(b) ............................................................................................................ 11

17 C.F.R. § 40.2 ................................................................................................................... 10

17 C.F.R. § 40.11(a) ............................................................................................................ 11

73 Fed. Reg. 25,669 (May 7, 2008) ...................................................................................... 3

91 Fed. Reg. 35,806 (June 12, 2026) .......................................................................... 3, 9, 11

Case 2:26-cv-00749-WCG    Filed 06/16/26    Page 6 of 23    Document 36

Plaintiffs the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission") file this reply in support of their preliminary-injunction motion, Dkt. 6 ("Mot.") and in opposition to Defendants' ("Wisconsin's") opposition. Dkt. 31 ("Opp.").

## INTRODUCTION

Wisconsin gets the legal issues in this case backwards. It insists that sports event contracts are gambling under *state law*, and therefore, they cannot be subject to the Commission's regulation under *federal law*. That is not how preemption works. Under the plain text of the Commodity Exchange Act ("CEA"), event contracts—including those based on sporting events—are "swaps," and thus, the Commission has "exclusive jurisdiction" to regulate them. And once that is established, all of Wisconsin's maneuvers for contorting the CEA's text—a "federalism-based presumption," the major-questions doctrine, avoiding purported conflict with unrelated gambling statutes—go by the wayside.

The State's acceleration of enforcement, moreover, elevates the need for immediate injunctive relief. At a May status conference, Wisconsin told the Court that no expedited schedule was necessary because it had not filed a preliminary-injunction motion in federal court in its pending enforcement actions against Designated Contract Markets ("DCMs") and Futures Commission Merchants ("FCMs"). Yet on the very day Wisconsin opposed Plaintiffs' motion here, it sought a preliminary injunction in the Western District that would prohibit Kalshi, Coinbase, and Robinhood from making any sports-related event contracts available in Wisconsin. *See Wisconsin v. Kalshi, Inc.*, No. 3:26-cv-00378, Dkt. 62 (W.D. Wis. June 9, 2026). That development underscores the urgent and direct conflict between the Commission's exclusive regulatory authority and Wisconsin's contrary state-law regime. The Court should promptly and decisively resolve that conflict in the Commission's favor.

1

**ARGUMENT**

**I.      Wisconsin's usurpation of the Commission's jurisdiction causes an injury in fact**

Wisconsin disputes the federal government's Article III standing to defend its agency's

jurisdiction in court.  Opp. 7.  As Plaintiffs have explained, that aggressive standing theory is belied

by a century of case law.  *See* Dkt. 34.  Plaintiffs are likely to succeed in establishing standing.

**II.      Plaintiffs are likely to succeed on the merits**

**A.  The Court should give the text its best reading**

Courts should "use every tool at their disposal to determine the best reading of the statute."

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).  Wisconsin asks this Court to do

something different: to load the statutory-interpretation dice in the State's favor by applying two

clear-statement rules against the CFTC's exclusive jurisdiction over swaps.  Neither rule applies.

Start with what Wisconsin calls "a federalism-based presumption against preemption."

Opp. 8.  That presumption has no role here.  When a "statute contains an express pre-emption

clause," as the CEA does, courts "do not invoke any presumption against pre-emption but instead

focus on the plain wording of the clause, which necessarily contains the best evidence of Congress'

pre-emptive intent."  *Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016)

(citation modified).  Nor can Wisconsin's demanding clear-statement requirement be reconciled

with implied preemption which—by definition—arises by inference.  *See Kansas v. Garcia*, 589

U.S. 191, 203 (2020) ("[I]t has long been established that preemption may also occur by virtue of

restrictions or rights that are inferred from statutory law.").  And though Wisconsin claims that the

preemption standard should be ratcheted up because "[t]his case involves gambling regulations, a

traditional area of state concern," Opp. 8, that logic presupposes that event contracts are not CEA-

regulated swaps.  *See* 31 U.S.C. § 5362(1)(E) ("The term 'bet or wager' . . . does not include

. . . any transaction conducted on or subject to the rules of a registered entity or exempt board of

2

trade under the Commodity Exchange Act"); Wis. Stat. § 945.01(1)(a)1. (the term "bet" does not include "[c]ontracts for the purchase or sale at a future date of . . . commodities").[1] Also: "the regulation of *interstate* gambling isn't a traditional area of state regulation." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025).

The State's major-questions argument fares no better. Opp. 9–10. That doctrine is triggered "[w]hen an agency claims to discover in a long-extant statute an unheralded [regulatory] power." *Utility Air Reg. Grp. v EPA*, 573 U.S. 302, 324 (2014). The Commission has done no such thing: it has regulated event contracts as binary options and swaps for decades, and as the underlying subject matter of those contracts has extended to sports, the Commission has continued to exercise regulatory jurisdiction as it always has. *See* 91 Fed. Reg. 35,806, 35,813–17 (June 12, 2026) (detailing history of Commission regulation of prediction markets); 73 Fed. Reg. 25,669, 25,671 (May 7, 2008) (explaining that "[s]ince 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts" based on "events"). Rather, it is the *States* that are using private-market developments as an excuse to exercise newfound authority over derivatives markets. Furthermore, as Wisconsin acknowledges (at 9), the major-questions rule applies when a federal agency invokes "modest words" or "vague terms" to claim for itself an "[e]xtraordinary grant[] of regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation modified). Unlike other major-questions cases, the CFTC is not invoking a "backwater" provision of the CEA. *Id.* at 730. Rather, it is relying on the Commission's "exclusive

---

[1] Wisconsin says that even if sports event contracts are swaps under *federal law*, they still qualify as bets under Wisconsin law because "commodities" must be "tangible goods." Opp. 25–26. But that would only intensify the conflict with federal law, as *intangible*-commodity derivatives—such as interest-rate swaps or foreign-currency swaps—are among the highest-volume transactions on the nation's largest derivatives exchanges. Wisconsin's "tangible" gloss exposes these transactions to state gambling regulation.

3

jurisdiction" over swap transactions—one of the most transformative changes wrought by the Dodd-Frank Act. And there is nothing "vague" about the statutory text: it straightforwardly allows the Commission to regulate event contracts, including contracts involving sports.

### B. The Commission's exclusive jurisdiction over swaps precludes state interference

Wisconsin also denies the CEA's preemptive force. The State tries to sell a modest theory—that the CEA does not "preempt Wisconsin's gambling law *as applied to sports betting*." Opp. 10 (emphasis added). But the CEA's preemption provisions do not distinguish between sports and everything else. So if the CEA's "exclusive jurisdiction" provision (and its otherwise-comprehensive regulatory structure) does not bar States from prohibiting sports event contracts, that logically means States could ban *any* type of swap—including interest-rate swaps, currency swaps, and energy swaps that undergird the modern financial system. Indeed, States could ban futures contracts altogether, as many did before the field of derivatives regulation was federalized. *See, e.g.*, *Carson v. Milwaukee Produce Co.*, 113 N.W. 393, 395 (Wis. 1907) (describing quintessential futures as "gambling contracts, and void"). But as the Seventh Circuit has explained, the CEA was enacted to avoid that very result. *American Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) ("The Act's proponents were concerned that the states . . . might step in to regulate the futures markets themselves."). Wisconsin's anti-preemptive theory should therefore raise immediate pause.

***Express Preemption.*** Congress vested the Commission with "exclusive jurisdiction" over "transactions involving swaps . . . traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). As the Seventh Circuit has explained, to give "full effect" to the exclusive-jurisdiction provision, Congress necessarily "intended to preempt some, but not all, state laws that bear upon the various aspects of commodity futures trading." *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *American Agric.*, 977 F.2d at 1155).

4

"[P]reemption is appropriate," the court explained, "'[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Id.* (quoting *American Agric.*, 977 F.2d at 1156). That is precisely the case here: by bringing enforcement actions to prohibit the listing of "swaps" on CFTC-approved DCMs, Wisconsin is directly interfering with on-DCM trading. Section 2(a)(1)(A) forecloses that intrusion.

Wisconsin nonetheless calls § 2(a)(1)(A) an "unusual express-preemption provision" because Congress did not use magic words like "preempt" or "supersede." Opp. 11 (quoting *KalshiEX, LLC v. Schuler*, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026)). But the Seventh Circuit has twice held that § 2(a)(1) has preemptive effect, so that dog won't hunt. *Effex*, 933 F.3d at 894; *Am. Agric.*, 977 F.2d at 1155; *see also KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 229 (3d Cir. 2026) ("as our sister circuits have held, the Act preempts state law purporting to regulate futures trading"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("[C]ourts have held that [§] 2(a)(1) of the CEA preempts the application of state law."). Indeed, if there is anything "unusual" about § 2(a)(1)(A), it is its robustness. Congress did not simply strip state law of effect, as a so-called "usual" preemption clause would. The CEA goes further by vesting sole *regulatory jurisdiction* in a federal agency, which displaces state law and even displaces state enforcement. *Cf. Wells Fargo Bank, Nat'l Ass'n v. Lake of the Torches Economic Development Corp.*, 658 F.3d 684, 687 (7th Cir. 2011) (Class I gaming "is left entirely 'within the exclusive jurisdiction of the Indian tribes'" and thus "remains unregulated by state or federal law" (quoting 25 U.S.C. § 2703(6))). And Congress reinforced that exclusivity elsewhere in the CEA: the provision addressing the "Jurisdiction of States" grants States limited authority to sue for federal-law violations or breaches of generally applicable antifraud laws (but not gambling laws). 7 U.S.C.

5

§ 13a-2(1), (7). Were States generally free to enforce state or federal law against CEA-regulated transactions, these narrow carveouts would be surplusage.

Next, Wisconsin claims the exclusive-jurisdiction provision merely "[a]llocat[es] authority among federal regulatory agencies." Opp. 12. Not so. In the very next sentence, Congress specified: "*Except as hereinabove provided*, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States *or of any State*, or (II) restrict the [SEC] *and such other authorities* from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A) (emphases added). Swap transactions are "hereinabove provided," meaning Congress did "supersede" and "limit the jurisdiction" of States, and did "restrict" them "from carrying out their duties and responsibilities" as to those transactions. *Id.* Indeed, if the exclusive-jurisdiction provision was not preemptive, there would be no need for this savings clause. *Effex*, 933 F.3d at 894 (preemption follows from the "savings clause and the jurisdictional clause"); *KalshiEX, LLC v. Johnson*, 2026 WL 1223373, at *6 (D. Ariz. May 5, 2026) ("A savings clause underscores the CFTC's preemptive effect, as state regulatory authority is preserved only '[e]xcept as hereinabove provided'—that is, except where the CEA has vested exclusive jurisdiction in the CFTC.").

Wisconsin also points to § 16(e)(2), which "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" for contracts that are "excluded" by the CEA or "exempted" by the Commission. 7 U.S.C. § 16(e)(2). Because sports event contracts are not "excluded" or "exempted," Wisconsin contends that "[t]he only possible inference is that state gaming regulation (including over sports betting) may continue elsewhere." Opp. 14.

6

That gets § 16(e)(2) exactly backwards.  An "excluded" contract is, by definition, *outside* the Commission's exclusive jurisdiction.  7 U.S.C. §§ 2(c), (f), 27–27f.  And the Commission's exemptive authority allows it to release certain contracts from CEA requirements.  *Id.* § 6(c).  Section 16(e)(2) therefore functions as a preemptive backstop: even for transactions largely beyond the CEA's purview, state gambling laws still cannot apply.  Wisconsin's theory—that state gambling law is preempted only for contracts *beyond* the Commission's jurisdiction, but not contracts *within* its jurisdiction—makes no sense.  To the contrary, if Congress preempted state gambling law even with respect to excluded or exempted contracts, it follows *a fortiori* that it preempted state gambling law as to on-DCM transactions within the Commission's exclusive jurisdiction.[2]  *See* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. Bus. Rev. 1, 6 (2019) ("Exclusive jurisdiction under section 2(a)(1)(A) is also preemptive jurisdiction; it has a much broader preemptive reach than gaming and bucket shop law-style preemption under section 12(e)(2)(B), which covers only excluded or exempt contracts over which the CFTC would [generally] have no jurisdiction.").

The remainder of § 16(e) confirms this reading.  Section 16(e)(1) provides that "[n]othing

---

[2] The history of § 16(e)(2) bolsters this.  Before Dodd-Frank, swaps generally fell outside the CFTC's jurisdiction: former § 2(g) excluded swap transactions between "eligible contract participants" from the CEA's requirements.  Yet even then, § 16(e)(2) preempted state gambling laws as to those excluded swap transactions.  *See* 7 U.S.C. §§ 2(g), 16(e)(2) (2008).  In short, state gambling law was unquestionably preempted for swaps between eligible contract participants.

Then in Dodd-Frank, Congress subjected all swaps to the Commission's exclusive jurisdiction and deleted the § 2(g) exclusion, which necessarily rendered § 16(e)(2)'s reference to § 2(g) swap transactions "obsolete."  Taylor-Brill, *supra* at 9.  Under Wisconsin's interpretation, that change *eliminated* preemption of state gambling law for swaps—even as Congress placed swaps under exclusive federal supervision.  That is implausible.  The far more natural inference is that Congress left the CEA's preemption of state gambling law intact—and, in fact, extended its preemptive reach to *all* state law.  *See id.* at 8 ("In using the CEA's exclusive jurisdiction clause to eliminate the ability of states to prohibit or otherwise regulate non-exempt swaps and swaps trading activities, Title VII extended the preemptive effect of the CEA to any state laws.").

in this chapter shall supersede or preempt . . . the application of any . . . State statute (*except as provided in paragraph (2)*) . . . to any transaction . . . that is *not* conducted on or subject to the rules of a registered entity," like a DCM.  7 U.S.C. § 16(e)(1)(B) (emphases added).  In other words, for *off-DCM* transactions, state law—though not state gambling law—remains available.  For that savings clause to do any work, it necessarily follows that transactions conducted *on a DCM* are subject to federal law only.  And there is more: when Congress added "swaps" to the Commission's exclusive jurisdiction, it deliberately chose *not* to make § 16(e)(1) applicable to swaps at all.  *See id.* § 2(d) ("Nothing in this chapter . . . governs or applies to a swap" except various provisions, including § 16(e)(2) but not § 16(e)(1).); Taylor-Brill, *supra* at 6 ("The exclusion of swaps from section 12(e)(1) was a clear expression of congressional intent as to how the new preemption model is supposed to work under section 2(a)(1)(A).").  Thus, the net effect of § 16 is to preserve (1) some state law, but not gambling law, (2) with respect to non-swap transactions, (3) conducted off DCMs.  It therefore must be true that (1) state gambling law, (2) with respect to swap transactions, (3) conducted on DCMs, lies in the CEA's preemptive heartland.

**Field Preemption.**  Wisconsin further claims that "[t]he CEA does not preempt the entire field of *sports betting regulation*."  Opp. 13 (emphasis added).  That statement is correct so far as it goes, but it would only apply here if one presupposes that event contracts are not swaps under the CEA, as Wisconsin does.  Given that "sports-related event contracts are swaps under the Act," the "scope of field preemption" is "properly defined" "as the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field)."  *Flaherty*, 172 F.4th at 229.  And on-exchange derivatives trading is unquestionably the subject of federal preemption.  *See, e.g.*, *Effex*, 933 F.3d at 894 ("[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'").

8

From this vantage point, Wisconsin's gaming-centric counters to field preemption collapse. It principally argues that "many provisions in the CEA permit state regulation of gaming." Opp. 13–14 (citation modified). "The most powerful evidence," the State says, is § 16(e)(2), which preempts state gambling law as to certain excluded or exempted transactions. Opp. 14. But as explained, § 16(e)(2) does not limit gambling-law preemption *only* to excluded or exempted transactions; it extends preemption *even* to those transactions. A non-excluded and non-exempted transaction comes within the Commission's exclusive jurisdiction—meaning that state law, including gambling law, is preempted. So much for the State's "most powerful evidence."

Wisconsin then invokes the statutory Special Rule, which allows the Commission to prohibit the listing of event contracts if the contracts "involve" "activity that is unlawful under any . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). Wisconsin reads this as permission for States to declare event contracts unlawful. Not so. The Special Rule applies "if the contract or transaction's *underlying event* relates in some way to activity that is illegal—not if the act of staking money on the contract's underlying would be unlawful under any state law." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *12 (D.D.C. Sept. 12, 2024) (emphasis added); *see* 91 Fed. Reg. at 35,821–22 (incorporating this interpretation). Here, the underlying event is a sporting contest, so the event contracts do not "involve" "activity that is unlawful." 7 U.S.C. § 7a-2(c)(5)(C)(i). Wisconsin also gestures to other savings clauses (at 14), but those have no application to the relevant field: "the regulation of trading on a DCM." *Flaherty*, 172 F.4th at 229.

The State further argues that "multiple other federal statutes" assume that the field of sports betting remains open to state regulation. Opp. 14. But again, that argument could only stick if one assumes that DCMs' event contracts are "betting" and not "swaps." The Unlawful Internet Gambling Enforcement Act expressly draws this line: Congress recognized that "[t]he term 'bet

or wager' . . . does not include . . . any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act." 31 U.S.C. § 5362(1). Because event contracts are CEA-regulated swaps, *infra* 11–14, unrelated federal gambling laws do not speak to the issue. And in all events, none of the statutes cited by Wisconsin gives regulatory authority to States. *See Ho-Chunk Nation v. Kalshi Inc.*, 2026 WL 1284077, at *10 (W.D. Wis. May 11, 2026) (distinguishing IGRA claims from any state-law authority to regulate event contracts).

**Conflict Preemption.** Wisconsin also denies that state and federal law conflict. It claims that "the CEA requires Kalshi and the like to receive federal agency approval to operate their prediction markets," but "the CEA doesn't expressly prohibit stricter state standards"—in fact, "if a State does *not* allow these contracts, then the CEA's requirements are simply irrelevant." Opp. 18. That is a remarkable claim. Taken seriously, it would render "the CEA's requirements . . . simply irrelevant" whenever Wisconsin (or any State) chose to prohibit a future, option, or swap—reviving "exactly the patchwork [of state law] that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

Federal law makes on-DCM swap trading a federal matter. *See* 7 U.S.C. § 5(a) (identifying "a national public interest" in derivatives trading). Pursuant to the CEA and federal regulations, the Commission has approved the DCMs targeted by Wisconsin for operation. 7 U.S.C. § 7(a); 17 C.F.R. § 38.3. Those DCMs have self-certified their event contracts for listing, and the Commission has permitted these contracts to be listed. *Id.* § 7a-2(c)(1); 17 C.F.R. §§ 38.4, 40.2. Wisconsin seeks to ban these contracts under state law, directly undermining the "comprehensive regulatory structure" that Congress created "to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982);

10

*contra Wyeth v. Levine*, 555 U.S. 555, 574–75 (2009) (cited at Opp. 17) (rejecting conflict preemption because "all evidence of Congress' purposes" weighed against it).

Compliance with federal and state law is also impossible. Federal law requires a DCM to provide "impartial access to its markets and services" through "non-discriminatory" "[a]ccess criteria." 17 C.F.R. § 38.151(b). Yet Wisconsin seeks to "enjoin[] [DCMs and FCMs] from making sports-related event contracts available for trading by customers located in Wisconsin," which would require DCMs to discriminate by residency. *Kalshi*, No. 3:26-cv-00378, Dkt. 62 (W.D. Wis. June 9, 2026); *see Johnson*, 2026 WL 1223373, at *8 (state ban would require DCM to "exclude Arizona residents" in violation of impartial-access rule); *Kalshiex LLC v. Orgel*, 2026 WL 474869, at *9 (M.D. Tenn. Feb. 19, 2026) (holding that the rule bars discrimination by "geographic location"). Wisconsin's enforcement effort thus requires what federal law forbids.

With little elaboration, Wisconsin suggests that state and federal law are compatible because 17 C.F.R. § 40.11(a) already prohibits event contracts based on "gaming," including sports. But as the underlying statutory provision states, the Commission has *discretion* to prohibit particular event contracts involving "gaming" that the Commission determines to be "contrary to the public interest"—there is no blanket prohibition on such contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); *see* 91 Fed. Reg. at 35,859 (proposing to amend § 40.11(a) to conform to the statute). If anything, this framework reinforces that the Commission alone determines whether such contracts are contrary to the public interest, not all 50 States.

## C. Event contracts are swaps

A contract is a swap if "payment" is (1) "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" that (2) is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Sports event contracts satisfy both prongs. *See* Mot. 11–13.

11

**1.** Wisconsin musters only halfhearted textual objections. First, it says that sports event contracts are based on "outcomes" rather than "events" or "contingencies." That is a false dichotomy: an "outcome" *is* an "event." *See Event*, Webster's II New College Dictionary (3d ed. 2025) (defining "event" to mean "[t]he actual outcome or final result"). Indeed, virtually all event contracts—not just sports event contracts—are based on outcomes. CME Group—the largest derivatives exchange in the world—offers event contracts keyed to the next Federal Funds rate decision, which is the outcome of an event (an FOMC meeting). Political event contracts pay based on the outcome of an election, though the election is also an event. *Orgel*, 2026 WL 474869, at \*7 ("President Trump winning the 2024 presidential election was an outcome, but also an event."). Likewise, the final result of a game is an event, no less than the game itself. *Id.* ("[A] three-hour-long game, and the Titans' winning that game, are both occurrences of events.").

Second, Wisconsin denies that sporting events are associated with potential economic consequences. That is simply not plausible. As the Third Circuit explained, sports events affect "numerous [] stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th 227–28. Unable to deny that logic, Wisconsin recasts the statute to require "an inherent connection to financial measures and instruments." Opp. 23 (citation modified). But nothing in the text supports that result. To the contrary, the event need only be "associated" with a "potential" economic consequence; those qualifiers would be meaningless if the event needed an "inherent" financial character. Moreover, under the statutory Special Rule, event contracts involving "terrorism," "assassination," "war," and "gaming" fall within the swap framework. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i). None of these events has an "inherent connection to financial measures and instruments." Opp. 23. The same is true for contracts based on the weather, which is a classic derivative long regulated by the CFTC.

12

But they all can carry potential economic consequences, which is all the statute requires.

**2.** Wisconsin itself seems to have tempered enthusiasm for its textual arguments, as it frontloads *contextual* arguments that warp its reading of the actual text at issue. That is not how statutory interpretation works. *See Dec v. Mullin*, 171 F.4th 940, 944 (7th Cir. 2026) ("If the statute's plain meaning is unambiguous, the interpretive inquiry ends and application begins."). Regardless, context does not support Wisconsin either.

First, it observes that there are six definitions of a "swap" in the CEA, *see* 7 U.S.C. § 1a(47)(A)(i)–(vi), and it urges that subparagraph (ii) (the "event or contingency" definition) be limited to "financial instrument[s]" to avoid swallowing the other "swap" definitions. Opp. 20. But that creates the opposite problem: it leaves subparagraph (ii) with nothing to do, since the other swap definitions cover the waterfront of finance-related contingencies. Of course, a fair read of subparagraph (ii) creates some redundancy with the other "swap" definitions. But overlap is inevitable in this context: subparagraph (iv), for instance, defines "swap" to include a contract that "is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). A redundancy-free interpretation being impossible, the Court should simply apply the text as written. *See Bufkin v. Collins*, 604 U.S. 369, 387 (2025) ("[W]hen both interpretations involve the same redundancy, the canon against surplusage simply does not apply.").

Next, Wisconsin urges the Court to read the "swap" definition in the context of federal gaming statutes. But Congress has rejected conflating the CEA with gambling law. *Supra* 2–3. Unrelated gambling laws cannot be imported to narrow the CEA.

The State also warns that if sports event contracts are swaps, "all sports bets" would be "forced onto prediction markets." Opp. 21 (citation modified). History belies that speculation: the Commission has regulated event contracts for years without exercising jurisdiction over actual

13

sports betting, and the evolution of event contracts to sports has not disrupted that balance. Furthermore, the State ignores the structural differences between sportsbooks that enable sports betting and CFTC-approved DCMs that list event contracts, sports-related or otherwise. Sportsbooks act as a casino or "house" that directly bets against its users—if the bettor wins, she takes the "house's" money; if not, the sportsbook pockets the bettor's wager. The sportsbook moves betting lines so that, in aggregate, it always generates a profit. DCMs, by contrast, are neutral exchanges that match counterparties (including sportsbooks[3]) and collect transaction fees, similar to any other futures or swaps exchange. That the latter are within the Commission's jurisdiction does not demand the same of the former. *Cf.* 31 U.S.C. § 5362(1)(E) (distinguishing CEA-regulated products from gambling).

**3.** Event contracts are also "swaps" because they are an "option of any kind that is . . . based on the value[] of 1 or more . . . commodities." 7 U.S.C. § 1a(47)(A)(i). Wisconsin disagrees, first because it says "sports-related event contracts are not 'options.'" Opp. 23. Wrong: event contracts are "binary options," which "have payoffs that are discontinuous, either paying nothing or a considerable amount depending on the satisfaction of some condition." *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 36 (D.D.C. 2015). A sports event contract will "either pay[] nothing" or something "depending on the satisfaction of some condition"—the outcome of the game. *Id.* Second, Wisconsin says that event contracts are not "based on the value" of an enumerated item. Wrong again: they are based on a "commodity"—specifically, an "excluded commodity" which is "an occurrence, extent of an occurrence, or contingency . . . that is . . . [1] beyond the control of the parties [and] . . . [2] associated with a financial, commercial,

---

[3] *See, e.g.*, Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 22, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

14

or economic consequence." 7 U.S.C. § 1a(19)(iv), (47)(A)(i). A sporting event checks both boxes.

### III. The balance of harms favors a preliminary injunction

Because Plaintiffs are likely to succeed on the merits, Wisconsin's irreparable-harm and equities arguments fall away quickly. It mostly relitigates its theory that the United States lacks standing to defend its jurisdiction in its own courts (at 28–30), which is meritless, *see* Dkt. 34. Otherwise, it claims that "a State 'suffers a form of irreparable injury' any time a court enjoins it 'from effectuating statutes enacted by representatives of its people.'" Opp. 27. But that presumes the application of *state law* is valid. Where, as here, "valid laws in a domain of federal authority are undermined by impermissible state regulations," it is "*[t]he United States* [that] suffers injury." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) (emphasis added); *see also United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("[I]rreparable harm [to the United States] necessarily results from allowing California to enforce a law invalid under the [Supremacy Clause]."). And Wisconsin is not merely threatening future action: it is actively seeking a preliminary injunction to enjoin the listing of sports event contracts in Wisconsin, exacerbating the irreparability of the harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law.").

Finally, "[f]rustration of federal statutes and prerogatives are not in the public interest," *Alabama*, 691 F.3d at 1301, and thus, "[t]he public does not have an interest in the enforcement of state laws that conflict with federal laws," *Staffing Servs. Ass'n of Illinois v. Flanagan*, 720 F. Supp. 3d 627, 642 (N.D. Ill. 2024) (citation modified). Here, "the [CEA] preempts [Wisconsin] law," and so "the public interest is best served by enforcing the Act." *Flaherty*, 172 F.4th at 232.

### CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

15

Dated: June 16, 2026

Respectfully Submitted,

/s/ Henry J. Dickman
Henry J. Dickman (DC Bar No. 1724459)

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St. NW
Washington, DC 20001
Tel:  202-860-8970
tiberius.davis@usdoj.gov

ALEXANDRA McTAGUE SCHULTE
Senior Litigation Counsel
Tel:  202-718-0483
alexandra.schulte@usdoj.gov

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANDREW WEISBERG
Senior Assistant General Counsel
MARGARET P. AISENBREY
Senior Assistant General Counsel

U.S. Commodity Futures Trading
Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 418-5607
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
aweisberg@cftc.gov
maisenbrey@cftc.gov

16

## CERTIFICATE OF COMPLIANCE

I certify that, in compliance with General Local Rule 5(a)(6) and Civil Local Rule 7(f), this response in opposition does not exceed 15 pages and is written in Times New Roman font, size 12.

Date: June 16, 2016

/s/ Henry J. Dickman
Henry J. Dickman

## CERTIFICATE OF SERVICE

I certify that on June 16, 2026, I filed this response in opposition on the Court's CM/ECF system, which will serve all registered counsel of records for parties who have appeared in this action.

/s/ Henry J. Dickman
Henry J. Dickman

17